JUDGE CAPRONI

Jason M. Drangel (JD 7204)
jdrangel@ipcounselors.com
Ashly E. Sands (AS 7715)
asands@ipcounselors.com
Spencer Wolgang (SW 2389)
swolgang@ipcounselors.com
Mary Kate Brennan (MB 5595)
mbrennan@ipcounselors.com
EPSTEIN DRANGEL LLP
60 East 42nd Street, Suite 2520
New York, NY 10165
Telephone:     (212) 292-5390
Facsimile:     (212) 292-5391
*Attorneys for Plaintiffs*
*WowWee Group Limited,*
*WowWee Canada, Inc. and*
*WowWee USA, Inc.*

17 CV 9358

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WOWWEE GROUP LIMITED, WOWWEE CANADA, INC., and WOWWEE USA, INC., *Plaintiffs* <br><br> v. <br><br> A249345157, ABAS, ALIAMOON, ARC WORLD ELECTRONIC (SHENZHEN) LIMITED, B2CTRADER88, CAIG, CHENXUE123, CHMIYA, COCOKI, COCOXF, CURRYDOUBLE, DAILYSPREE, DENKAPPARAT, DILUSS, DLF0003, DONGGUAN BENRAY CRAFTS & ARTS CO., LTD., DONGGUAN DEEP DREAM ELECTRONIC CO., LIMITED, DONGGUAN SANKE MOULD&PLASTIC MANUFACTURE CO., LTD., DONGGUAN SHENGSI INDUSTRIAL CO., LTD., DONGGUAN SHENGTANG SILICONE PRODUCTS CO., LTD., DONGGUAN WANSHENG SILICONE PRODUCTS CO., LTD., DONGGUAN XIE XING ELECTRONIC PLASTIC CO., LTD., DONGGUAN YOULIMEI SPORTING GOODS CO., LIMITED A/K/A KEDIMEI ELECTRONICS | **CIVIL ACTION No.** <br><br><br> **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' 1)** *EX PARTE* **APPLICATION FOR A TEMPORARY RESTRAINING ORDER; 2) AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE; 3) ASSET RESTRAINING ORDER; 4) ORDER AUTHORIZING ALTERNATIVE SERVICE BY ELECTRONIC MEANS AND 5) ORDER AUTHORIZING EXPEDITED DISCOVERY** <br><br><br> **FILED UNDER SEAL** |

i

(SHENZHEN) CO., LIMITED, DONGGUAN YUYANG MUSICAL INSTRUMENT CO., LTD. A/K/A ZHIXIAN INDUSTRIAL LIMITED, DONGGUAN ZEQI PACKING CO., LTD. A/K/A HONG KONG CP-LINK CO., LTD, DORISZP, EONFUN, ERAINBOW, FASHION888TOY, FASHION9TOY, FASHIONFORWARD, FENGZU OUTDOOR STORE, FIRING, FRANKASON, FRANKMONEY, FROZENTOYS, FUZHOU RICHFORTH TRADE CO., LTD., FXSUM STATIONERY STORE, GGGZXL151019, GLASSPARADISE, GLOBALBSD888, GOTRICHTECH, GUANGZHOU ARFMA ELECTRONIC CO., LTD., GUOJINQUNQUN1, HAITENGBAO, HANGZHOU EASYLIN TRADE CO., LTD., HANGZHOU YIGE TRADE CO., LTD, HENGYI (GUANGZHOU) TRADING IMP. & EXP. CO., LTD., HYL950215, IRIS TECHNOLOGY CO., LTD., ISHENNONG, JAYTOYOFFICIAL, JESSE2017, JHZ666888, KADEN, KIMWOOD1608, KKCARDS, KOLAMOM STORE, LACHAPBELL, LEMEIHUI03, LEO_TOYS, LING2017, LWHONEY, MAIZHONGGOOD, MAXDREAM2017, MIKEXU888, MINEYKIDS, NANCHANG YONG GUAN TRADING CO., LTD., NANJING BONGEM IMPORT & EXPORT CO., LTD NINGBO FENGHUA GOGO AUTOMATIC TRADING COMPANY LIMITED, NINGBO H&D IMPORT AND EXPORT CO., LTD., NINGBO HUISEN RUBBER & PLASTIC TECHNOLOGY CO., LTD., NINGBO LANGMING IMPORT AND EXPORT LIMITED, NINGBO LENO TRADING CO., LTD., OG INTELLIGENCE STORE, OLYMPICYIM, OSINDUSTRIAL, OUHOEHKDH, OUSUSUNBABY STORE, PINKEMPRESSFANS002 A/K/A SHENZHEN PIRATE CAPTAIN TRADE CO., LTD., POINTOUCH1, ROCKYTSANG, SANCEY, SHANDONG SIMON BEARING CO., LTD., SHANGHAI2008, SHANTOU SMILOR TOYS FACTORY A/K/A SMILOR INDUSTRIAL

CO., LTD., SHANXI XIN SHI YU
COMMERCIAL AND TRADE CO., LTD.,
SHAOXING SOFA PROMOTION CO., LTD.,
SHENZHEN AISK ELECTRONIC CO.,
LIMITED, SHENZHEN AUGUSTSMOKE
TECHNOLOGY CO., LTD, SHENZHEN
BESTBUYTEC CO., LTD., SHENZHEN BOF
TECHNOLOGY CO., LIMITED, SHENZHEN
CHUANGSHIZC TECHNOLOGY CO., LTD.,
SHENZHEN DEEPFANS TECHNOLOGY
CO., LTD., SHENZHEN EBST TRADING CO.,
LTD., SHENZHEN EJOY TECHNOLOGY
CO., LTD., SHENZHEN E-MYWAY
INDUSTRIAL CO., LTD., SHENZHEN
ETINDGE ELECTRONIC CO., LTD.,
SHENZHEN EVER GRAND TECHNOLOGY
CO., LTD.
SHENZHEN FLYDA TECHNOLOGY CO.,
LTD., SHENZHEN FOREMOST
INDUSTRIAL CO., LTD., SHENZHEN FUJIA
ELECTRONICS CO., LTD., SHENZHEN FWY
TECHNOLOGY CO., LTD., SHENZHEN
GREIA TECHNOLOGY CO., LIMITED,
SHENZHEN HAOYUNWEI TECHNOLOGY
CO., LTD., SHENZHEN HERO
TECHNOLOGY CO., LTD., SHENZHEN
HONGSONIC ELECTRONICS CO., LTD.,
SHENZHEN HUAWEN TECHNOLOGY CO.,
LTD., SHENZHEN HYD TECHNOLOGY
LTD., SHENZHEN JBK PET TECHNOLOGY
CO., LTD., SHENZHEN JIEJIA TRADING
COMPANY LIMITED, SHENZHEN JINPIN
BALANCE TECHNOLOGY CO., LTD.,
SHENZHEN JUSTCIG TECHNOLOGY CO.,
LTD., SHENZHEN MAKEWAY TRADING
CO., LTD., SHENZHEN MIDSUN
TECHNOLOGY COMPANY LIMITED,
SHENZHEN MINSHUNLONG TRADING
CO., LTD., SHENZHEN NABOWEI
TECHNOLOGY CO., LTD., SHENZHEN NEW
FLY TECHNOLOGY CO., LTD., SHENZHEN
NOTION ELECTRONICS CO., LTD.,
SHENZHEN ONLY ACE LIGHTING TECH
CO., LTD., SHENZHEN P PLUS GIFT CO.,
LTD., SHENZHEN PACIFIC OCEAN
ELECTRONIC LTD., SHENZHEN SANDI

DIGITAL CO., LTD., SHENZHEN SICMP
PRINTING CO., LTD. | SHENZHEN TRULY
BEAUTY INDUSTRY CO., LTD, SHENZHEN
SPIRE TECHNOLOGY CO., LTD.,
SHENZHEN SUNLIGHTS INNOVATION &
TECHNOLOGY CO., LTD., SHENZHEN
SUOYA BUSINESS CO., LTD., SHENZHEN
TAI LI TECHNOLOGY CO., LTD.,
SHENZHEN UNION CREATE JI YE
TECHNOLOGY CO., LTD., SHENZHEN
UPLUS TECHNOLOGY CO., LTD.,
SHENZHEN VICTEKE TECHNOLOGIES
CO., LTD., SHENZHEN XINWANGGU
TECHNOLOGY LIMITED, SHENZHEN
XINYUE ELECTRONIC CO., LTD.,
SHENZHEN YUNWEI TECHNOLOGY CO.,
LTD., SHENZHEN0721, SHINY&BEAUTY1
STORE, SHOPPINGMALLTOY, SIXIREN
TOY CO., LTD., GUANGZHOU, SOUTHSEA
FLYING DRAGON(SHENZHEN)
TECHNOLOGY CO., LTD., SUPERCARD,
TIANJIN YAO POLY IMPORT AND EXPORT
LIMITED COMPANY, TOPKIDSCLOTHES,
TOYSCODA, TOYSFUNNY,
TOYSSTORE2017, TRADEUNIVERSE,
TSMQ, TTOYS STORE, TYHM A/K/A NEW
NETWORK TECHNOLOGY CO., LTD, UNIQ
ELECTRONICS TECHNOLOGY SHENZHEN
CO., LIMITED, VIEEO, VOLCANEE02,
WFZTZG01, WHITEDOLPHIN,
WILLDEN_SUNGLASSES, WIN BEST
IMPORT AND EXPORT CO., LTD., WISEBIZ
(SHENZHEN) TECHNOLOGY LIMITED,
WWWMICSELLCOM__, WXT694375379,
XIAMEN PAPLER INDUSTRY CO., LTD.,
XINGNING BESTEN INDUSTRIAL CO.,
LTD., YIWU CADDY AARTS&CRAFTS
FACTORY, YIWU DINGQIANG IMPORT
AND EXPORT CO., LTD., YIWU FOZO
CRAFT FACTORY, YIWU JINMING E-
TRADING FIRM, YIWU LINGSHUO
TRADING CO., LTD. A/K/A YIWU UNITED
CRAFTS CO.,LTD, YIWU LIUHE CLOTHING
FACTORY, YIWU MAX FIRM IMPORT &
EXPORT CO., LTD., YIWU ROYAL
COMMODITY CO., LTD., YIWU ZHOUTING

TRADE CO., LTD., YOUNEED TRADING
STORE, YTING3, ZHANGBX, ZHIZUN12
AND ZHUHAI HAIYUAN TECHNOLOGY
CO., LTD.

*Defendants*

## TABLE OF CONTENTS

I.  INTRODUCTION..................................................................................... 1

II.  STATEMENT OF RELEVANT FACTS............................................ 6

    A.  PLAINTIFFS' BUSINESS AND ITS FINGERLINGS PRODUCTS .............. 6

    B.  DEFENDANTS' UNLAWFUL AND INFRINGING CONDUCT ................... 8

        1.  Plaintiffs' Investigation of Defendants' User Accounts........................ 9

III.  ARGUMENT .................................................................................. 15

    A.  THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS ................. 15

        1.  Defendants are Subject to Personal Jurisdiction Under N.Y. C.P.L.R. § 302(a)(1) ................................................... 16

        2.  Defendants are Subject to Personal Jurisdiction Under N.Y. C.P.L.R. § 302(a)(3) ................................................... 24

        3.  Exercising Personal Jurisdiction Over Defendants Comports With Due Process ................................................... 26

    B.  PLAINTIFFS ARE ENTITLED TO AN *EX PARTE* TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION............................... 27

        1.  Plaintiffs Will Suffer Irreparable Harm in the Absence of an Injunction Leaving Plaintiffs with No Adequate Remedy at Law ................................................... 31

        2.  Plaintiffs are Likely to Prevail on the Merits of their Lanham Act Claims................................................... 34

            a)  *The Fingerlings Marks are Strong and Distinctive* ...................... 35

            b)  *Defendants' Counterfeit Products and Marks are Virtually Identical to the Fingerlings Products and Fingerlings Marks* ................................................... 36

            c)  *Defendants' Counterfeit Products Directly Compete with the Fingerlings Products and There is No Gap to Bridge* ............ 37

            d)  *Actual Confusion Can Be Inferred Between Defendants' Counterfeit Products and the Fingerlings Products* ..................... 38

            e)  *Defendants Acted in Bad Faith* ...................................... 39

            f)  *Defendants' Counterfeit Products Are of Inferior Quality* ........... 40

            g)  *The Sophistication of Purchasers* .................................. 40

        3.  Plaintiffs are Likely to Prevail on their Copyright Act Claims.......... 41

            h)     *Plaintiffs own Valid Copyrights in their Fingerlings Works* ........ 41

            i)     *Defendants Infringed Plaintiffs' Fingerlings Works* .................... 41

      **4.    Plaintiffs are Likely to Prevail on their State Law Claims** ................ 43

      **5.    The Balance of Hardships Favors Plaintiffs** ......................................... 44

      **6.    Enjoining Defendants from Using the Fingerlings Marks and
            Fingerlings Works Will Serve the Public Interest** ................................ 45

C.    PLAINTIFFS ARE ENTITLED TO AN ORDER PREVENTING THE
      FRAUDULENT TRANSFER OF ASSETS ........................................................................ 45

D.    PLAINTIFFS ARE ENTITLED TO AN ORDER AUTHORIZING
      ALTERNATIVE SERVICE OF PROCESS BY ELECTRONIC MEANS .................... 51

E.    PLAINTIFFS ARE ENTITLED TO AN ORDER AUTHORIZING EXPEDITED
      DISCOVERY .............................................................................................................. 56

F.    PLAINTIFFS' REQUEST FOR A SECURITY BOND IN THE AMOUNT OF
      $5,000 IS ADEQUATE .............................................................................................. 58

IV.   CONCLUSION .............................................................................................................. 59

# TABLE OF AUTHORITIES

**Cases**

*A + E TV Networks, LLC v. Wish Factory*, 2016 U.S. Dist. LEXIS 33361 (S.D.N.Y. 2016) .......................................................................................................................... 25

*A. T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689 (2d Cir. 1972) ............................ 37

*Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341 (Fed. Cir. 2008) ........................................................ 33

*Abercrombie & Fitch Trading Co. v. Abercrombieandfitchdk.com*, No. 15-62068-CIV-BLOOM, 2015 U.S. Dist. LEXIS 179117 (S.D. Fla. Oct. 7, 2015) .................................. 23

*Adidas AG v. 007adidasuk.com*, No. 15-61275-CIV-GAYLES, 2015 U.S. Dist. LEXIS 179020 (S.D. Fla. July 13, 2015) ..................................................................................... 23

*Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.*, No. 94 Civ. 5620 (JFK), 1994 U.S. Dist. LEXIS 18457 (S.D.N.Y. Dec. 28, 1994). .................................... 56

*Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2010) ...................................................................................................................... 23

*Allstar Marketing Group, LLC v. GB Housewear Store, et al.*, No. 17-cv-7596-SHS Dkt. 22 (S.D.N.Y. Oct. 12, 2017) ............................................................................... 18, 19, 48

*Alpha Int'l, Inc. v. T-Reproductions, Inc.*, 2003 U.S. Dist. LEXIS 11224, 2003 WL 21511957 (S.D.N.Y. July 1, 2003) ................................................................................... 17

*AW Licensing, LLC v. Bao*, No. 15- CV-1373, 2015 U.S. Dist. LEXIS 177101 (S.D.N.Y. Apr. 1, 2015) ............................................................................................................................ 6

*Ayyash v. Bank Al-Madina*, 233 F.R.D. 325 (S.D.N.Y. 2005) ...................................................... 56

*Balenciaga Am., Inc. v. Dollinger*, No. 10 Civ. 2912 (LTS), 2010 U.S. Dist. LEXIS 107733 (S.D.N.Y. Oct. 8, 2010) ...................................................................................... 46

*Belstaff Grp. SA v. Doe*, No. 15-cv-2242 (PKC)(MHD), 2015 U.S. Dist. LEXIS 178124 (S.D.N.Y. June 18, 2015) ........................................................................................................ 6

*Best Van Lines, Inc. v. Walker*, 490 F.3d 239 (2d Cir. 2007) .................................... 15, 16, 22, 27

*Best Van Lines, Inc. v. Walker*, No. 03 Civ. 6585 (GEL), 2004 U.S. Dist. LEXIS 7830 (S.D.N.Y. May 4, 2004) ........................................................................................................ 22

*Boisson v. Banian, Ltd.*, 273 F.3d 262 (2d Cir. 2001) ................................................................. 41

*Boschetto v. Hansing*, 539 F.3d 1011 (9th Cir. 2008) ................................................................. 20

*Broad. Music, Inc. v. Prana Hosp.*, Inc., 158 F. Supp. 3d 184 (S.D.N.Y. 2016) ........................ 44

*Burberry Ltd. v. Euro Moda, Inc.*, No. 08 Civ. 5781 (CM), 2009 U.S. Dist. LEXIS 53250, 2009 WL 1675080 (S.D.N.Y. June 10, 2009) .................................................................. 35

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (U.S. 1985)........................................................ 27

*Cadbury Beverages Inc. v. Cott Corp.*, 73 F.3d 474 (2d Cir. 1996)............................................. 37

*Calder v. Jones*, 465 U.S. 783 (1984)............................................................................................ 27

*Cartier v. Seah LLC*, 598 F. Supp. 2d 422 (S.D.N.Y. 2009) ...................................................... 22

*Chanel Inc. v. Yang*, No. C-12-04428 PJH (DMR), 2013 U.S. Dist. LEXIS 151104 (N.D.
    Cal. Aug. 13, 2013).............................................................................................................. 10

*Chanel, Inc. v. 2012leboyhandbag.com*, No. 15-61986-CIV-ZLOCH, 2015 U.S. Dist.
    LEXIS 177989 (S.D. Fla. Oct. 13, 2015)............................................................................ 23

*Chanel, Inc. v. Chanelsstore.com*, No. 15-61156-CIV, 2015 U.S. Dist. LEXIS 179101
    (S.D. Fla. Aug. 31, 2015).................................................................................................... 23

*Chanel, Inc. v. Conklin Fashions, Inc.*, No. 3:15-CV-893 (MAD/DEP), 2015 U.S. Dist.
    LEXIS 109886 (N.D.N.Y. Aug. 14, 2015) ........................................................................... 6

*Chanel, Inc. v. Powell*, No. C/A 2:08-0404-PMD-BM, 2009 U.S. Dist. LEXIS 127709
    (D.S.C. Mar. 31, 2009) ......................................................................................................... 10

*Chloe v. Designersimports.com USA, Inc.*, No. 07-CV-1791 (CS)(GAY), 2009 U.S. Dist.
    LEXIS 42351 (S.D.N.Y. Apr. 29, 2009) ............................................................................... 6

*Chloe v. Queen Bee of Beverly Hills*, LLC, 616 F.3d 158 (2d Cir. 2010) ............................ 16, 17

*Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549 (S.D.N.Y. 2000)............................. 16, 22

*CJ Prods. LLC v. Concord Toys Int'l.*, 2011 U.S. Dist. LEXIS 4983 (E.D.N.Y. 2011)). ............ 45

*CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127 (E.D.N.Y. 2011) ........................ 32

*Dedvukaj v. Maloney*, 447 F. Supp. 2d 813 (E.D. Mich. 2006)................................................... 21

*DH Servs., LLC v. Positive Impact, Inc.*, 2014 U.S. Dist. LEXIS 14753 (S.D.N.Y. 2014) ......... 25

*Dial-A-Mattress Operating Corp. v. Mattress Madness*, 841 F. Supp. 1339 (E.D.N.Y.
    1994) .................................................................................................................................... 35

*Dig. Sin, Inc. v. Does 1-176*, 279 F.R.D. 239 (S.D.N.Y. 2012).................................................... 57

*DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81 (2d Cir. N.Y. 2001) .......................................... 25

*Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975 (2d Cir. 1996)....................................................... 59

*E.I. duPont de Nemours & Co. v. Yoshida International, Inc.*, 393 F. Supp. 502
    (E.D.N.Y. 1975)................................................................................................................... 39

*El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir. 1986), *cert.
    denied*, 484 U.S. 817, 98 L. Ed. 2d 34, 108 S. Ct. 71 (1987) ........................................... 33

*Energy Brands, Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458 (S.D.N.Y. 2008).......... passim

*EnviroCare Techs., LLC v. Simanovsky*, No. 11-CV-3458(JS)(ETB), 2012 U.S. Dist. LEXIS 78088 (E.D.N.Y. June 4, 2012) ............................................................... 19, 20, 21

*Etna Products Co. v. Dacofa Trading Co.*, 1992 U.S. Dist. LEXIS 2924 (S.D.N.Y. Mar. 9, 1992) .................................................................................................................... 24

*Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168 (2d Cir. 2000)) ......................... 31

*Feist Publ'ns, Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340 (1991) ........................................ 41

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993 (2d Cir. 1997) .......................... 37

*George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d Cir. 1992) .................................. 46

*Grand v. Schwarz*, No. 15-CV-8779 (KMW), 2016 U.S. Dist. LEXIS 61606 (S.D.N.Y. May 10, 2016) ....................................................................................................................... 17

*GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273 (S.D.N.Y. 2002) ................................. 43

*Gucci Am. v. Bank of China*, 768 F.3d 122, (2d Cir. 2014) .......................................................... 47

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ............ 35

*Gucci Am., Inc. v. Gucc-Outlet.com*, No. 15-62165-CIV-GAYLES, 2015 U.S. Dist. LEXIS 181483 (S.D. Fla. Nov. 9, 2015) ........................................................................... 23

*Gucci Am., Inc. v. Tyrrell-Miller*, 678 F. Supp. 2d 117 (S.D.N.Y. 2008) ................................... 10

*Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87 (S.D.N.Y. 2015) ........................................... 16

*Gucci America, Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060 (S.D.N.Y. 1991) ................. 39

*Gucci America, Inc., et al v. Alibaba Group Holding LTD, et al*, No. 1:15-cv-03784 (PKC) (S.D.N.Y. June 23, 2015) ...................................................................................... 5

*Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251 (1916) ......................................... 47

*Hsin Ten Enterprise USA, Inc. v. Clark Enterprises*, 138 F. Supp. 2d 449 (S.D.N.Y. 2000) ......................................................................................................................... 18, 22

*Ideavillage Products Corp. v. chinafocus et al.*, No. 17-cv-3894-RA, Dkt. 19 (S.D.N.Y. May 24, 2017) ............................................................................................................ passim

*Illinois v. Hemi Group LLC*, 622 F.3d 754 (7th Cir. 2010) ......................................................... 23

*In re Vuitton et Fils, S.A.*, 606 F.2d 1 (2d Cir. 1979) .................................................................... 6

*Interlink Int'l Fin. Servs., Inc. v. Block*, 145 F. Supp. 2d 312 (S.D.N.Y. 2001) .......................... 59

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ...................................................................... 15

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66 (2d Cir. 199 ....................................................................................................................................... 46

*Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 348 F. Supp. 2d 165
(S.D.N.Y. 2004) ............................................................................................... 43

*Klipsch Grp., Inc. v. Big Box Store Ltd.*, No. 1:12-cv-06283 (VSB), 2012 U.S. Dist.
LEXIS 153137 (S.D.N.Y. Oct. 24, 2012) ............................................................ 6

*Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123 (S.D.N.Y. 1993) ............... 39

*Kwan v. Schlein*, 634 F.3d 224 (2d Cir. 2011) ............................................................. 41

*Le Book Publ'g, Inc. v. Black Book Photography, Inc.*, 418 F. Supp. 2d 305 (S.D.N.Y.
2005) ....................................................................................................... 35

*Lechner v. Marco-Domo Intnationales Interieur GmbH*, No. 03 Civ. 5664 (JGK), 2005
U.S. Dist. LEXIS 4022 (S.D.N.Y. Mar. 10, 2005) ............................................ 24

*Licci v. Lebanese Canadian Bank*, 732 F.3d 161 (2d Cir. 2013) ..................................... 15

*Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15 Civ. 8459 (LGS), 2016
U.S. Dist. LEXIS 89149 (S.D.N.Y. July 8, 2016) ...................................... 19, 20

*Lipenga v. Kambalame*, No. GJH-14-3980, 2015 U.S. Dist. LEXIS 172778 (D. Md.
2015) ....................................................................................................... 53

*Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224 (2d
Cir. 1992) ................................................................................................. 31

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir. 1986) ..................... 36

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532 (2d
Cir. 2005) ................................................................................................. 30

*Louis Vuitton Malletier, S.A. v. 2015shoplvhandbag.com*, No. 15-62531-CIV-
BLOOM, 2015 U.S. Dist. LEXIS 181477 (S.D. Fla. Dec. 18, 2015) .............................. 23

*Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1356-58 (11th Cir. 2013) .................. 22

*M. Shanken Commc'ns, Inc. v. Cigar500.com*, No. 07 Civ. 7371 (JGK), 2008 U.S. Dist.
LEXIS 51997 (S.D.N.Y. July 7, 2008) ............................................................ 17

*Malcolm v. Esposito*, 63 Va. Cir. 440 (Cir. Ct. 2003) ................................................. 21

*Malibu Media, LLC v. Doe*, No. 1:16-cv-02462-AJN, 2016 U.S. Dist. LEXIS 64656
(S.D.N.Y. May 16, 2016) ............................................................................ 56

*Malibu Media, LLC v. Doe*, No. 15 Civ. 4369 (AKH), 2015 U.S. Dist. LEXIS 87751
(S.D.N.Y. July 6, 2015) .............................................................................. 56

*Malletier v. 2015louisvuittons.com*, No. 15-61973-CIV-BLOOM, 2015 U.S. Dist. LEXIS
181452 (S.D. Fla. Sep. 29, 2015) ................................................................. 23

*Malletier v. 2016bagsilouisvuitton.com*, No. 16-61554-CIV-GAYLES, 2016 U.S. Dist.
LEXIS 93072 (S.D. Fla. July 18, 2016) .................................................... 10, 23

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618 (N.D. Ill. 2000) ................................................................................................................. 56

*Milk Studios, LLC v. Samsung Elecs. Co.*, No. 14 Civ. 09362 (PAC), 2015 U.S. Dist. LEXIS 38710 (S.D.N.Y. Mar. 25, 2015) ........................................................ 56

*Milliken v. Meyer*, 311 U.S. 457 (1940) ................................................................. 27

*Mint, Inc. v. Iddi Amad*, No. 10 Civ. 9395 (SAS), 2011 U.S. Dist. LEXIS 49813 (S.D.N.Y. May 9, 2011) ............................................................... 33, 41, 42, 44

*Mitchell Grp. USA LLC v. Udeh*, No. 14-cv-5745, 2015 U.S. Dist. LEXIS 18801 (E.D.N.Y. Feb. 17, 2015) ..................................................................... 32, 44

*Monster Energy Co. v. Chen Wensheng*, 136 F. Supp. 3d 897 (N.D. Ill. 2015) .......................... 23

*Moose Toys Pty LTD et al. v. Guangzhou Junwei Trading Company d/b/a Backgroundshop et al., No. 17-cv-2561-LAK*, Dkt. 12 (S.D.N.Y. May 11, 2017) ....... 5, 18

*Moose Toys Pty, Ltd. v. Thriftway Hylan Blvd. Drug Corp.*, No. 15-CV-4483 (DLI)(MDG), 2015 U.S. Dist. LEXIS 105912 (E.D.N.Y. Aug. 6, 2015) ........................ 29

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950) ................................................. 54

*Mycoskie v. 2016tomsshoessaleoutlet.us*, No. 16-61523-CIV-GAYLES, 2016 U.S. Dist. LEXIS 95963 (S.D. Fla. July 22, 2016) ...................................................................... 23

*N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514 (S.D.N.Y. 2013) ............... 43

*N. Face Apparel Corp. v. Fujian Sharing Imp. & Exp. Ltd. Co.*, No. 1:10-cv-1630 (AKH), 2011 U.S. Dist. LEXIS 158807 (S.D.N.Y. June 24, 2011) ................................... 6

*N.Y. State Soc'y of CPA's v. Eric Louis Assocs.*, 79 F. Supp. 2d 331 (S.D.N.Y. 1999) ............... 39

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010) .............................................................................................................................. 45

*New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194 (9th Cir. 1979) ......................... 35

*NYP Holdings v. New York Post Pub. Inc.*, 63 F. Supp. 3d 328 (S.D.N.Y. 2014) ....................... 31

*Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210 (11th Cir. 2011) ................................... 22

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014) ................................................. 47

*Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*, 2004 U.S. Dist. LEXIS 10426 (E.D.N.Y. 2004) .............................................................................................................................. 38

*Philip Morris USA Inc. v. 5 Bros. Grocery Corp.*, 2014 U.S. Dist. LEXIS 112274, 2014 WL 3887515 (E.D.N.Y. 2014) ......................................................................................... 44

*Polymer Technology Corp. v. Mimran*, 975 F.2d 58 (2d Cir. N.Y. 1992) .................................... 40

*Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970 (Fed. Cir. 1996) ................................................ 33

*Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261, 268-269 (E.D.N.Y. 2011) ................................................................................................................................ 40

*Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC*, 553 F. Supp. 2d 201 (E.D.N.Y. 2008) ................................................................................................................ 38

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359 (Fed. Cir. 2001) .............. 33

*Rado Watch Co. v. ABC, Co.*, 1992 U.S. Dist. LEXIS 8356 (S.D.N.Y. 1992) ............................ 37

*Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552 (9th Cir. 1992) ................................ 48

*Richemont N. Am., Inc. v. Linda Lin Huang*, No. 12 Civ. 4443 (KBF), 2013 U.S. Dist. LEXIS 136790 (S.D.N.Y. Sep. 24, 2013) ............................................................................ 35

*Rolex Watch, U.S.A., Inc. v. Pharel*, 2011 U.S. Dist. LEXIS 32249 (E.D.N.Y. Mar. 11, 2011) ................................................................................................................................ 22

*SEC v. Caledonian Bank Ltd.*, No. 15-cv-894, 2016 U.S. Dist. LEXIS 133298 (S.D.N.Y. Sep. 28, 2016) ...................................................................................................................... 50

*Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390 (1940) ................................................ 47

*Skrodzki v. Marcello*, 810 F. Supp. 2d 501, 512-13 (E.D.N.Y. 2011) .......................................... 22

*Spin Master Ltd. and Spin Master, Inc. v. Amy & Benton Toys and Gifts Co., Ltd., et al.*, No. 17-cv-5845-VSB (S.D.N.Y. Aug. 4, 2017) .................................................... 5, 18, 19, 49

*Star Indus. v. Bacardi & Co.*, 412 F.3d 373 (2d Cir. 2005) .......................................................... 38

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97 (2d Cir. 2009) ............................ 38

*Stern v. Cosby*, 246 F.R.D. 453 (S.D.N.Y. 2007) ........................................................................ 57

*Sulzer Mixpac AG v. Medenstar Indus. Co.*, 312 F.R.D. 329 (S.D.N.Y. 2015) ............................ 51

*Tcpip Holding Co. v. Haar Communs. Inc.*, 244 F.3d 88 (2d Cir. 2001). ...................................... 35

*The National Football League v. Mono Lee d/b/a nflnfl.us*, No. 11-CV-8911 (PKC) (S.D.N.Y. Dec. 7, 2011) ...................................................................................................... 53

*Thomas Publ'g Co. v. Indus. Quick Search*, 237 F. Supp. 2d 489 (S.D.N.Y. 2002) ................... 17

*Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010) ......................................................... 34

*Tiffany (NJ) LLC v. Forbse*, No. 11 Civ. 4976 (NRB), 2012 U.S. Dist. LEXIS 72148 (S.D.N.Y. 2012) ...................................................................................................................... 46

*Time Warner Entertainment Co., L.P. v. Does*, 876 F. Supp. 407 (E.D.N.Y. 1994) ................... 29

*Tory Burch, LLC v. Yong Sheng Int'l Trade Co., Ltd.*, No. 1:10-cv-09336 (DAB) (S.D.N.Y. Jan. 4, 2011) ......................................................................................................... 6

*True Religion Apparel, Inc. et al. v. Xiaokang Lee et al.*, No. 1:11-cv-08242 (HB) ...................... 6

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F.Supp.2d 515 (S.D.N.Y. 2011); ............ 31

*Virgin Enterprises v. Nawab*, 335 F.3d 141 (2d Cir. 2003) ..................................................... 38, 40

*Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76 (2d Cir. 1981) ............................................ 38

*Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, No. 00 Civ. 8051 (JSM), 2000 U.S.
    Dist. LEXIS 15664 (S.D.N.Y. 2000) ...................................................................... 46

*Yurman Design, Inc. v. PAJ Inc.*, 262 F.3d 101 (2d Cir. 2001) .................................................. 41

*Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238 (2d Cir. 2009) ..................................................... 33

*Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W. D. Pa. 1997) ............ 22

## Statutes

15 U.S.C. § 1057(b) ................................................................................................................... 33

15 U.S.C. § 1116(d)(1)(a) ....................................................................................................... 26, 27

15 U.S.C. § 1117(a) ................................................................................................................... 44

17 U.S.C. § 410(c) ..................................................................................................................... 39

17 U.S.C. § 501(a) ..................................................................................................................... 39

17 U.S.C. § 504(b) ..................................................................................................................... 44

Fed. R. Civ. P. 26(d)(1) ............................................................................................................. 55

Fed. R. Civ. P. 4(k)(2) ............................................................................................................... 22

Fed. R. Civ. P. 65(b) ................................................................................................................. 26

Fed. R. Civ. P. 65(d)(2)(C) ........................................................................................................ 56

N.Y. C.P.L.R. § 302(a)(3)(ii) ..................................................................................................... 22

## Other Authorities

The Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents
    in Civil and Commercial Matters, November 15, 1965 ................................................... 50

## I.   **INTRODUCTION**

Pursuant to and in accordance with the Federal Rules of Civil Procedure, Plaintiff WowWee Group Limited, Plaintiff WowWee Canada, Inc. and Plaintiff WowWee USA, Inc. ("WowWee" or "Plaintiffs"), submit this memorandum of law in support of their *ex parte* application for:  1) a temporary restraining order; 2) an order to show cause why a preliminary injunction should not issue; 3) an asset restraining order; 4) an order authorizing alternative service by electronic mail and 5) an order authorizing expedited discovery against above-referenced Defendants (and more completely identified in Paragraphs 7 through 185 of the Complaint) in light of Defendants' intentional and willful offering for sale and/or sales of Infringing Products (as defined *infra*) ("Application").

Alibaba.com, AliExpress.com and DHgate.com are global online marketplace platforms ("Digital Marketplaces") which allow manufacturers, wholesalers and other third-party merchants, like Defendants, to advertise, offer for sale, sell, distribute and ship their wholesale and retail products originating from China directly to consumers across the world and specifically to consumers residing in the U.S., including New York. *Declaration of Mary Kate Brenna ("Brennan Dec.")*, ¶ 3.  As the leaders of China's e-commerce and digital retail market, the Digital Marketplaces have generated hundreds of billions in sales worldwide. *See id.*, ¶ 4. International markets, including the U.S., make up a significant percentage of the Digital Marketplaces' sales. *See id.*, ¶ 5. For example, in the last fiscal year, revenue from international retail sales grew by 25% on AliExpress.com to $342 million and 15% on Alibaba.com to $841 million. *See id.*  The press reported that the growth in sales on AliExpress.com resulted from an increase in the number of buyers, particularly from the U.S., as well as other large countries like Russia and Brazil. *See id.*  Additionally, according to *Business Insider*, excluding China, the U.S. was among the top five countries with packages coming from Alibaba's marketplaces on

1

the company's "Singles' Day" (often compared to the U.S.'s Cyber Monday) in 2015, which resulted in over $14 billion in sales in one day. *See id.* Further, DHgate.com offers 25 million consumer products from 1.2 million suppliers for sale on its platform and attributes over half of its sales to U.S. buyers alone. *See id.*

As recently addressed in the *Wall Street Journal*, *Fortune*, *New York Times* and other reputable publications, numerous federal lawsuits have been filed against China-based sellers (along with the Digital Marketplaces themselves and stand-alone websites) as a result of the astronomical number of counterfeit and/or infringing products that are being offered for sale and sold through the Digital Marketplaces at a rampant rate. *See id.*, ¶ 6. The Office of the United States Trade Representative ("USTR") publishes an annual "Notorious Markets List" which highlights specific physical and online markets around the world that are reported to be engaging in and facilitating substantial copyright piracy and trademark counterfeiting, and which is intended to help the U.S. and foreign governments prioritize intellectual property rights ("IPR") enforcement that protects job-supporting innovation and creativity in the U.S. and around the world. *See id.*, ¶ 7. In December 2015, the USTR released the results of its Special 301 Out-of-Cycle Review of Notorious Markets for 2015. *See id.* It named DHgate.com as a "particularly infamous Notorious Market." *See id.* In December 2016, the USTR added Alibaba to its "Notorious Markets" list due to its high levels of "reported counterfeiting and piracy." *Id.* Despite the fact that the Digital Marketplaces have systems in place to report intellectual property infringement, sellers of counterfeit and/or infringing products frequently re-post their listings for such products on their respective User Accounts (as defined *infra*) once

taken down[1] or open a new User Account under a different seller name and post the same listings for counterfeit and/or infringing products. *See id.*, ¶ 8.

Defendants are individuals and/or businesses, who, upon information and belief, are located in China but conduct business in the United States and other countries by means of their respective User Accounts opened through the Digital Marketplaces. *See Declaration of Jessica Arnaiz* ("*Arnaiz Dec.*"), ¶¶ 4, 6, *Declaration of Richard Yanofksy* ("*Yanofksy Dec.*"), ¶¶ 18-20 and *Brennan Dec.*, ¶¶ 3, 14-16  Through their User Accounts, Defendants offer for sale and/or sell consumer products, including Infringing Products, and market, distribute and ship such products to consumers throughout the world, including the U.S., and specifically New York. *See Arnaiz Dec.*, ¶¶ 6-11, *Ex.* A; *Yanofsky Dec.*, ¶ 21; and *Brennan Dec.*, ¶ 3.  Sellers operating accounts on the Digital Marketplaces, like Defendants, often use evasive tactics such as aliases, false addresses and other incomplete identification information to conceal their identities and avoid detection. *See Brennan Dec.*, ¶ 12.  Since the Digital Marketplaces do not require the disclosure of sellers' registered business names or trade names, addresses or other contact information, sellers, like Defendants, use the Digital Marketplaces as a way to sell infringing and/or counterfeit products with almost total anonymity. *See id.*, ¶ 13.  In fact, Defendants' User Accounts are either devoid of any, or contain incomplete, information concerning Defendants' true identities, locations and contact information. *See id.*, ¶ 21.  To further conceal their identities, sellers on the Digital Marketplaces often use shipping or delivery services, such as EMS and DHL, which provide minimal tracking and/or contain false or incomplete return

---

[1] Notably, the Digital Marketplaces generally will not terminate a seller's account or membership after a single or even a second or third complaint of infringement against the seller. *See Brennan Dec.*, ¶ 7.  Pursuant to Alibaba.com's Posting Rules regarding the Penalty of Intellectual Property Rights Infringement, a seller's account is not terminated until the "fourth infringement complained by an identical rights holder based on an identical intellectual property." *Id.*  Under the AliExpress Intellectual Property Rights Protection Policy, a seller's membership with AliExpress.com is not terminated until at least four complaints of serious infringements have been received. *See id.*

addresses. *See id.*, ¶ 13. For these reasons, among others, the true identities, locations and contact information of Defendants, as well as the locations of the Infringing Products that Defendants are offering for sale and/or selling, are unclear and virtually impossible for Plaintiffs to obtain independently. *See id.*, ¶ 21.

Without Plaintiffs' authorization or consent, Defendants were and/or currently are manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or selling products bearing and/or using the Fingerlings Marks (as defined *infra*) and/or marks that are confusingly similar to, identical to and constitute an infringement of the Fingerlings Marks and/or displaying and/or incorporating the Fingerlings Works (as defined *infra*) and/or works that are substantially similar to, identical to and constitute infringement of the Fingerlings Works (hereinafter collectively referred to as "Counterfeit Products" or "Infringing Products") to consumers located in the U.S., including specifically to consumers in New York, through their User Accounts. *See Arnaiz Dec.*, ¶¶ 4-6, *Ex.* A; *Yanofsky Dec.*, ¶¶ 21, 23-24 and *Brennan Dec.*, ¶¶ 17-19, *Ex.* A. Defendants' aforementioned actions have caused and will continue to cause – should the requested relief be denied – irreparable harm to Plaintiffs' goodwill and reputation as well as to the unassuming consumers who will continue to believe that Defendants' inferior and potentially dangerous Infringing Products are authorized, sponsored, approved, endorsed and/or licensed by Plaintiffs when, in fact, they are not. *See Yanofsky Dec.*, ¶¶ 23-24.

Plaintiffs' request for *ex parte* relief is particularly necessary since Defendants are located in China and conduct business entirely over the Internet. Consequently, should Defendants receive notice of the claims and allegations against them, it is highly likely that they will transfer, conceal and/or destroy the inventory of the Infringing Products in their possession

and their means of making or obtaining such Infringing Products, along with all business records and any and all other evidence relating to their infringing activities, as well as hide or dispose of all of Defendants' Assets (as defined *infra*) to which Plaintiffs may be entitled. *See Brennan Dec.*, ¶¶ 11-13, 20. Considering that sellers on the Digital Marketplaces, like Defendants, usually conceal their identities, such sellers often circumvent temporary restraining orders issued with prior notice by disappearing, destroying any evidence of their infringing actions, and/or draining their financial accounts. *See id.* In light of the foregoing, and considering that it typically takes noticed Financial Institutions (as defined *infra*) and/or Third Party Service Providers (as defined *infra*) a minimum of five (5) days to locate, attach and freeze Defendants' Assets and/or Defendants' Financial Accounts (as defined *infra*), Plaintiffs respectfully request that the Court allow enough time for the Financial Institutions and/or Third Party Service Providers to freeze Defendants' Assets and Financial Accounts before ordering service on Defendants.

In light of the covert nature of Defendants' offshore infringing activities and the importance of creating economic disincentives for such infringing activities, courts in this Circuit have recognized these concerns and often granted *ex parte* applications for relief in similar instances of infringement on the Internet.[2] Accordingly, Plaintiffs respectfully request that this

---

[2] *See, e.g., Allstar Marketing Group LLC v._GB Housewear Store, et al.*, No. 17-cv-7596-SHS. Dkt. 22 (S.D.N.Y. Oct. 12, 2017); *Spin Master Ltd. and Spin Master, Inc. v. Alan Yuan's Store, et al.*, 17-cv-7422-DLC, Dkt. 19 (S.D.N.Y. Sept. 28, 2017); *Spin Master Ltd. and Spin Master, Inc. v. Amy & Benton Toys and Gifts Co., Ltd., et al.*, No. 17-cv-5845-VSB, Dkt. 17 (S.D.N.Y. Aug. 4, 2017); *Ontel Products Corp. v. Auto Mall, et al.*, No. 17-cv-5190-AT, Dkt. 6 (S.D.N.Y. July 18, 2017); *Rovio Entertainment Ltd. and Rovio Animation Oy v. Best Baby and Kid Store, et al.*, No. 17-cv-4884-KPF, Dkt. 6 (S.D.N.Y. June 28, 2017); *Ideavillage Products Corp. v. chinafocus et al.*, No. 17-cv-3894-RA, Dkt. 19 (S.D.N.Y. May 24, 2017); *Moose Toys Pty LTD et al. v. Guangzhou Junwei Trading Company d/b/a Backgroundshop et al.*, No. 17-cv-2561-LAK, Dkt. 12 (S.D.N.Y. May 11, 2017); *Rovio Entertainment Ltd. and Rovio Animation OY v. Angel Baby Factory d/b/a Angelbaby_factory et al.*, No. 17-cv-1840-KPF, Dkt. 11 (S.D.N.Y. March 27, 2017); *Ontel Products Corporation v. Airbrushpainting Makeup Store a/k/a Airbrushespainting et al.*, No. 17-cv-871-KBF, Dkt. 20 (S.D.N.Y. Feb. 6, 2017); *Ideavillage Products Corp. v. Bling Boutique Store, et al.*, No. 1:16-cv-09039-KMW, Dkt. 9 (S.D.N.Y. Nov. 21, 2016); *Gucci America, Inc., et al v. Alibaba Group Holding LTD, et al*, No. 1:15-cv-03784 (PKC) (S.D.N.Y. June 23, 2015) (unpublished); *Chanel, Inc. v. Conklin Fashions, Inc.*, No. 3:15-CV-893 (MAD/DEP), 2015 U.S. Dist. LEXIS 109886, at *10-13 (N.D.N.Y.

Court grant its *ex parte* Application for:  1) an order to show cause why a preliminary injunction should not issue; 2) a temporary restraining order; 3) an asset restraining order; 4) an order authorizing alternative service by electronic mail and 5) an order authorizing expedited discovery.

## II.    STATEMENT OF RELEVANT FACTS

### A.  PLAINTIFFS' BUSINESS AND ITS FINGERLINGS PRODUCTS

WowWee is a leading designer, developer, marketer and distributor of innovative robotic toys and consumer entertainment products ("Authentic Products").  WowWee promotes and sells its Authentic Products throughout the U.S., including in the State of New York, and throughout the world, through major retailers, quality toy stores, department stores, and online marketplaces, including, but not limited to, Toys R Us, Target, Walmart, Amazon and Gamestop.   One of WowWee's most popular and successful products are its Fingerlings toys, which are hand-held robotic toys that react to sound, motion, and touch and are designed to look various animals and/or other characters (*e.g.*, monkeys, unicorns and sloths) ("Fingerlings Product(s)").  *See Yanofsky Dec.*, ¶ 4.  The Fingerling Products are widely recognized as the must-have toy product for 2017, as indicated by the toy industry's leaders and features in major news outlets including, but not limited to, TTPM, Money Magazine, Good Housekeeping, Business Insider, Newsday, Yahoo!, The Toy Insider and CNN.  *See id.*, ¶ 5.  The Fingerlings Products generally retail for $14.99. *See id.*, ¶ 7.

Aug. 14, 2015); *Belstaff Grp. SA v. Doe*, No. 15-cv-2242 (PKC)(MHD), 2015 U.S. Dist. LEXIS 178124, at *2 (S.D.N.Y. June 18, 2015); *AW Licensing, LLC v. Bao*, No. 15- CV-1373, 2015 U.S. Dist. LEXIS 177101, at *2-3 (S.D.N.Y. Apr. 1, 2015); *Klipsch Grp., Inc. v. Big Box Store Ltd.*, No. 1:12-cv-06283 (VSB), 2012 U.S. Dist. LEXIS 153137, at *3-4 (S.D.N.Y. Oct. 24, 2012); *True Religion Apparel, Inc. et al. v. Xiaokang Lee et al.*, No. 1:11-cv-08242 (HB) (unpublished); *N. Face Apparel Corp. v. Fujian Sharing Imp. & Exp. Ltd. Co.*, No. 1:10-cv-1630 (AKH), 2011 U.S. Dist. LEXIS 158807 (S.D.N.Y. June 24, 2011); *Tory Burch, LLC v. Yong Sheng Int'l Trade Co., Ltd.*, No. 1:10-cv-09336 (DAB) (S.D.N.Y. Jan. 4, 2011) (unpublished); *Chloe v. Designersimports.com USA, Inc.*, No. 07-CV-1791 (CS)(GAY), 2009 U.S. Dist. LEXIS 42351, at *2 (S.D.N.Y. Apr. 29, 2009); *see also In re Vuitton et Fils, S.A.*, 606 F.2d 1 (2d Cir. 1979) (holding that *ex parte* temporary restraining orders are indispensable to the commencement of an action when they are the sole method of preserving a state of affairs in which the court can provide effective final relief).

While Plaintiffs have gained significant common law trademark and other rights in its Fingerlings Products through use, advertising and promotion, Plaintiffs also protected their valuable rights by filing for and obtaining federal trademark registrations. *See id.*, ¶¶ 10-11, Ex. C. For example, WowWee owns the following U.S. Trademark Registration Nos.: 3,289,747 for "WOW WEE" for a variety of goods in Class 9 and Class 28 ("WowWee Word Mark"), 4,505,483 for  for a variety of goods in Class 9 and Class 28 ("WowWee Robot Logo"), and 5,325,724 for "FINGERLINGS" for a variety of goods in Class 28 ("Fingerlings Mark") (the WowWee Word Mark, WowWee Robot Logo and Fingerlings Mark are collectively referred to as the "Fingerlings Marks"). *See id.* ¶ 9, Ex. C. The Fingerlings Marks are currently in use in commerce in connection with the Fingerlings Products. *See id.* The Fingerlings Marks were first used in commerce on or before the dates of first use as reflected in their respective registrations. *See id.*

In addition, Plaintiffs also own both registered and unregistered copyrights related to the Fingerlings Products. *See id.* ¶ 9, Ex. B. For example, WowWee is the owner of the following U.S. Copyright Registrations Nos.:VAu 1-289-245 covering the Fingerlings Monkey, VA 2-068-259 covering the Fingerlings Monkey Packaging, VA 2-068-535 covering the Fingerlings Unicorn, VA 2-070-852 covering the Fingerlings Unicorn Packaging, VA 2-070-721 covering the Fingerlings Sloth, VA 2-70-721 covering the Fingerlings Sloth Packaging and TX 8-431-649 covering the Fingerlings Monkey User Manual (collectively referred to as the "Fingerlings Works"). *See id.*

Plaintiffs have spent substantial time, money and effort in building up and developing consumer recognition, awareness and goodwill in the Fingerlings Products, Fingerlings Marks and Fingerlings Works. *See id.*, ¶ 14. These efforts include advertising and promotion through

social media, the Website, retailer websites and other internet-based and print advertising, among other efforts domestically and abroad, including New York. *See id.*, ¶ 14. The Fingerlings Products' success is also due to its use of high quality materials and processes in making the Fingerlings Products. *See id.*, ¶ 15. Additionally, Plaintiffs owe a substantial amount of the success of the Fingerlings Products to its consumers and word-of-mouth buzz that its consumers have generated. *See id.*, ¶ 16. As a result of Plaintiffs' efforts, the quality of its Fingerlings Products, its promotions, extensive press and media coverage and word-of-mouth buzz, the Fingerlings Products, Fingerlings Marks and Fingerlings Works have become prominently placed in the minds of the public. *See id.*, ¶ 18. Members of the public have become familiar with the Fingerlings Products, Fingerlings Marks and Fingerlings Works, and have come to recognize the Fingerlings Products, Fingerlings Marks and Fingerlings Works and associate them exclusively with Plaintiffs. *See id.* Plaintiffs acquired a valuable reputation and goodwill among the public as a result of such association. *See id.*

Plaintiffs have gone to great lengths to protect its interests in and to the Fingerlings Marks and Fingerlings Works. *See id.*, ¶ 20. No one other than Plaintiffs are authorized to manufacture, import, export, advertise, offer for sale or sell any goods utilizing the Fingerlings Marks and/or Fingerlings Works without the express written permission of Plaintiffs. *See id.*

## B. DEFENDANTS' UNLAWFUL AND INFRINGING CONDUCT

In light of the success of the Fingerlings Products, Plaintiffs and their Fingerlings Products have become targets for unscrupulous individuals and entities that wish to exploit the goodwill, reputation and fame of the Fingerlings Products, Fingerlings Marks and Fingerlings Works, and Plaintiffs routinely investigate and enforce against such unlawful activities. *See id.*, ¶ 21. Despite such efforts, Defendants have persisted in creating User Accounts on the Digital

Marketplaces through which they continue to advertise, distribute, offer for sale, sell and/or ship Infringing Products. *See Arnaiz Dec.*, ¶¶ 4-6, *Ex.* A; *Yanofsky Dec.*, ¶ 21 and *Brennan Dec.*, ¶¶ 15-17. Through Plaintiffs' investigative and enforcement efforts, it learned of Defendants' infringing actions, which vary and include, but are not limited to, manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or selling Infringing Products to U.S. consumers (including those located in the State of New York) through Defendants' User Accounts. *See Yanofsky Dec.*, ¶ 21.

### 1. Plaintiffs' Investigation of Defendants' User Accounts

Plaintiffs retained New Alchemy Limited ("NAL"), a company that provides trademark infringement research services and other intellectual property research services, to investigate and research manufacturers, wholesalers and/or third-party merchants offering for sale and/or selling Infringing Products on the Digital Marketplaces. *See Arnaiz Dec.*, ¶ 4; *Yanofsky Dec.*, ¶ 21 and *Brennan Dec.*, ¶ 14. During its investigation, NAL identified Defendants as offering for sale and/or selling Infringing Products through their respective User Accounts, contacted Defendants expressing interest in placing a bulk order for Infringing Products, and typically inquired as to whether payment could be made for said orders of Infringing Products through either Defendants' PayPal Inc. ("PayPal") accounts or by wire transfer directly to Defendants' bank accounts. *See Arnaiz Dec.*, ¶¶ 6-9, *Ex.* A. NAL also often requested Defendants' email addresses. *See id.*

Additionally, NAL specified a shipping address located in New York ("New York Address") and verified that each Defendant provides shipping to the New York Address. *See id.*, ¶¶ 10-11, *Ex.* A. AliExpress.com and DHgate.com have comprehensive checkout pages that automatically assign a shipping address to an order based on the address associated with the customer's user account. *See id.*, ¶ 12. Alibaba.com requires the completion of an order form,

which asks for the customer's shipping address. *See id.* In each instance, NAL completed an order form or checkout page for an order of Infringing Products from each Defendant either 1) through an account associated with a New York Address, or 2) by providing a New York Address as the shipping address. *See id.*, ¶ 13, *Ex.* A. Further, some Defendants provided NAL with pro forma invoices for the Infringing Products, which also display a New York Address as the shipping address. *See id.*

As a result of its review of Defendants' User Accounts and conversations with Defendants, NAL confirmed that Defendants were and/or are still currently offering for sale and/or selling Infringing Products through their respective User Accounts and that each Defendant ships and/or has actually shipped Infringing Products to the U.S., including to customers specifically located in New York. *See id.*, ¶ 15, *Ex.* A.

Through visual inspection of Defendants' listings for Infringing Products ("Infringing Listings"), Plaintiffs and/or Plaintiffs' counsel confirmed that the products that each Defendant offered for sale using virtually identical copies of the Fingerlings Marks and/or Fingerlings Works are, in fact, Infringing Products.[3] *See id.*, ¶ 7; *Yanofsky Dec.*, ¶ 23 and *Brennan Dec.*, ¶ 15-17.

Neither Plaintiffs nor Plaintiffs' counsel instructed NAL to complete the purchases for the Infringing Products for the following reasons: 1) most Defendants sell the Infringing

---

[3] *See, e.g., Gucci Am., Inc. v. Tyrrell-Miller*, 678 F. Supp. 2d 117, 119 (S.D.N.Y. 2008) (Plaintiff's Intellectual Property Manager found that the products offered for sale on the Defendant's websites were non-genuine counterfeit products, based on a visual inspection of Defendant's websites); *Malletier v. 2016bagsilouisvuitton.com*, No. 16-61554-CIV-GAYLES, 2016 U.S. Dist. LEXIS 93072, at *3 (S.D. Fla. July 18, 2016) (Plaintiff's representative reviewed the items bearing the Louis Vuitton Marks offered for sale through Defendant's Internet websites and determined the products to be non-genuine, unauthorized versions of the Plaintiff's products.); *Chanel Inc. v. Yang*, No. C-12-04428 PJH (DMR), 2013 U.S. Dist. LEXIS 151104, at *5-6 (N.D. Cal. Aug. 13, 2013) (Plaintiff's Director of Legal Administration reviewed the various Chanel-branded products offered for sale by Defendants on each of the websites operating under the subject domain names, and determined that the products were non-genuine Chanel products); *Chanel, Inc. v. Powell*, No. C/A 2:08-0404-PMD-BM, 2009 U.S. Dist. LEXIS 127709, at *7 (D.S.C. Mar. 31, 2009) (Plaintiff's representative personally reviewed the printouts reflecting the various Chanel brand products offered for sale by the Defendant through its website, and concluded that those products were non-genuine Chanel products).

Products in wholesale quantities only, thereby making the cost to purchase and store the Infringing Products prohibitive; 2) shipping the Infringing Products from China requires significant lead times, potentially causing an unnecessary and unreasonable delay in the filing of this action; and 3) Plaintiffs are able to confirm with certainty through the visual inspection of the Infringing Listings that the Infringing Products offered for sale by each Defendant in the Infringing Listings are, in fact, infringing, particularly given the extremely low prices at which Defendants are offering the Infringing Products, and no authorized Fingerlings Products whatsoever are available on the Digital Marketplaces. *See Brennan Dec.*, ¶ 19. As reflected in the copies of Defendants' Infringing Listings attached as Exhibit A to the *Arnaiz Dec.* and the side-by-side comparisons of the Fingerlings Products to Defendants' Infringing Products attached as Exhibit A to the *Brennan Dec.*, Defendants' Infringing Products are nearly indistinguishable from the Fingerlings Products, with only minor variations that no ordinary consumer would recognize. *See Arnaiz Dec., Ex.* A and *Brennan Dec.*, ¶¶ 15-17. Plaintiffs never authorized or consented to Defendants' use of the Fingerlings Marks or Fingerlings Works, or to Defendants' offering for sale or sale of the Fingerlings Products. *See Yanofsky Dec.*, ¶ 24.

For example, beneath on the left is an image of WowWee's Fingerlings Product, which typically retails for $14.99. Depicted beneath on the right is the listing for Defendant Arc World Electronic (Shenzhen) Limited's ("Arc World") Infringing Product ("Arc World Infringing Listing") that it offers for sale and/or sells through its Alibaba.com Storefront, https://arcworld.en.alibaba.com ("Arc World Storefront"), for $5.85 – 6.80 per item, using WowWee's Fingerlings Word Mark, or a confusingly similar mark, in the listing title "AWH200 2017 Hot Selling children toys **fingerling** toy finger monkey for children" (emphasis added) and featuring and/or incorporating one or more of WowWee's Fingerlings Marks, or a confusingly

similar mark and WowWee's Fingerlings Works, or substantially similar artwork, in the descriptions and/or product images in the body of the listing ("Arc World Infringing Product"). The Arc World Infringing Product is virtually identical to WowWee's Fingerlings Product and features and/or incorporates one or more of WowWee's Fingerlings Works and Fingerlings Marks. There is no question that the Arc World Infringing Product is designed to confuse and mislead consumers into believing that they are purchasing WowWee's Fingerlings Product or that the Arc World Infringing Product is otherwise approved by or sourced from WowWee, thereby trading off of the goodwill and reputation of WowWee by engaging in the unauthorized use of WowWee's Fingerlings Works and Fingerlings Marks:

**Fingerlings Products**                     **Arc World's Infringing Product**




As another example, beneath on the left is an image of WowWee's Fingerlings Product, which typically retails for $14.99. Depicted beneath on the right is the listing for Defendant caig's Infringing Product that it offers for sale and/or sells through its DHGate.com Storefront,

https://www.dhgate.com/store/20804445 ("caig Storefront"), for $9.05 - 9.90 per item (the "caig Infringing Product") using WowWee's Fingerlings Word Mark, or a confusingly similar mark, in the listing title (*i.e.*, "Have in stock Fingers Monkey toy **Fingerlings** Interactive Baby Monkey Finger Toys Monkey Electronic Smart Touch New arrival 6 colors ABS+PVC" (emphasis added)) and featuring and/or incorporating one or more of WowWee's Fingerlings Marks, or a confusingly similar mark and WowWee's Fingerlings Works, or substantially similar artwork, in the descriptions and/or product images in the body of the listing ("caig Listing"). The caig Infringing Product is virtually identical to WowWee's Fingerlings Product and features and/or incorporates one or more of WowWee's Fingerlings Works and Fingerlings Marks. It is indisputable that the caig Infringing Product is designed to confuse and mislead consumers into believing that they are purchasing WowWee's Fingerlings Product or that the caig Infringing Product is otherwise approved by or sourced from WowWee, thereby trading off of the goodwill and reputation of WowWee by engaging in the unauthorized use of WowWee's Fingerlings Works and Fingerlings Marks:

|  **Fingerlings Product**  |  **caig Infringing Product**  |
| :---: | :---: |
|  |  |



By way of another example, beneath on the left is an image of WowWee's Fingerlings Product, which retails for $14.99. Depicted beneath on the right is the listing for Defendant FXSUM Stationery Store's ("FXSUM") Infringing Product that it offers for sale and/or sells through its AliExpress.com Storefront, https://www.aliexpress.com/store/1522576 ("FXSUM Storefront"), for $5.13 – 18.41 per item (the "FXSUM Infringing Product") and using WowWee's Fingerlings Word Mark, or a confusingly similar mark, in the listing title (*i.e.*, "FXSUM Stationery Sets Ruler Solar Calculator + **Fingerlings** Interactive Baby Monkeys Toys for Kids School Student Christmas Gifts" (emphasis added)), and featuring and/or incorporating one or more of WowWee's Fingerlings Marks, or a confusingly similar mark and WowWee's WowWee's Fingerlings Works, or substantially similar artwork, on the descriptions and/or product images in the body of the listing ("FXSUM Infringing Listing"). The FXSUM Infringing Product is virtually identical to WowWee's Fingerlings Product and features and/or incorporates one or more of WowWee's Fingerlings Works and Fingerlings Marks. It is indisputable that the FXSUM Infringing Product is designed to confuse and mislead consumers into believing that they are purchasing WowWee's Fingerlings Product or that the FXSUM Infringing Product is otherwise approved by or sourced from WowWee, thereby trading off of the goodwill and reputation of WowWee by engaging in the unauthorized use of WowWee's Fingerlings Works and Fingerlings Marks:

**Fingerlings Product**                          **FXSUM Infringing Product**

            

## III.   ARGUMENT

### A.   THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS

Determining personal jurisdiction over a foreign defendant in a federal question case requires a two-step inquiry.  First, courts must look to the law of the forum state to determine whether personal jurisdiction will lie.  *See Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir. 2013) (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).  Second, if jurisdiction lies, the court then considers whether the district court's exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution.  *See id.*; *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Here, Defendants' unlawful, infringing activities, as alleged herein, subject them to long-arm jurisdiction in New York under N.Y. C.P.L.R. §§ 302(a)(1) and 302(a)(3), and New York's exercise of jurisdiction over Defendants thereunder comports with due process.

### 1. **Defendants are Subject to Personal Jurisdiction Under N.Y. C.P.L.R. § 302(a)(1)**

Under § 302(a)(1), there are two requirements that must be met in order to establish personal jurisdiction: "(1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Licci*, 732 F.3d at 168 (quoting *Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006)). In applying the test for the "transacts business" prong of § 302(a)(1), "New York decisions ... at least in their rhetoric, tend to conflate the long-arm statutory and constitutional analyses by focusing on the constitutional standard,"[4] ergo, "a defendant need not be physically present in New York to transact business there within the meaning of [this first prong]," so long as the defendant has engaged in "purposeful activity," for example, "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Chloe*, 616 F.3d at 169-71 (quoting *Best Van Lines, Inc.*, 490 F.3d at 246-247) (internal quotations omitted). The second prong of § 302(a)(1) requires an "articulable nexus or substantial relationship between the business transaction and the claim asserted," however, "a causal relationship between the business transaction and the claim asserted" is not required. *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 93 (S.D.N.Y. 2015) (internal citations and quotations omitted). Rather, it is sufficient that "the latter is not completely unmoored from the former." *Id.*

In determining whether a party has "transacted business," New York courts must look at the totality of the circumstances concerning the party's interactions with, and activities within, the state. *See Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000).

---

[4] *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 169-71 (2d Cir. 2010) (collecting cases); *see also Seldon v. Magedson*, No. 11 Civ. 6218 (PAC) (MHD), 2012 U.S. Dist. LEXIS 141616, at *33 (S.D.N.Y. July 9, 2012) ("The meaning of 'transacting business' under section 302(a)(1) 'overlaps significantly' with the minimum-contacts due-process test, however, New York's long-arm statute encompasses a wider range of activity than the minimum-contacts doctrine").

Whether the exercise of personal jurisdiction is permissible in the context of Internet activity is "directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Id.* (internal citations omitted). Thus, courts in the Second Circuit have regularly conferred personal jurisdiction on a given defendant based on that defendant's operation of an independent, fully interactive website through which consumers can access the site from anywhere and purchase products, as is the case with Defendants' User Accounts, which are accessible through the Digital Marketplaces, and allow for customers all over the world to communicate with Defendants and view and purchase products, including Infringing Products, as demonstrated by the order forms and checkout pages completed by NAL for orders of Infringing Products. *See Arnaiz Dec.*, ¶¶ 6-15, *Ex.* A; *see e.g.*, *Grand v. Schwarz*, No. 15-CV-8779 (KMW), 2016 U.S. Dist. LEXIS 61606, at *9 (S.D.N.Y. May 10, 2016) (holding that an interactive and commercial website provides support for jurisdiction under § 302(a)(1)); *Chloé*, 616 F.3d at 170 (conferring jurisdiction where defendant operated a "highly interactive" website where bags were offered for sale to New York consumers); *Energy Brands, Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458 (S.D.N.Y. 2008) (court exercised jurisdiction based on online purchases of twenty-nine orders of bottled water by consumers in New York through an interactive website); *M. Shanken Commc'ns, Inc. v. Cigar500.com*, No. 07 Civ. 7371 (JGK), 2008 U.S. Dist. LEXIS 51997, at *13-16 (S.D.N.Y. July 7, 2008) (finding § 302(a)(1) jurisdiction over defendants because the interactive website was primarily used to effect commercial transactions, even though the website did not specifically target the New York market); *Alpha Int'l, Inc. v. T-Reproductions, Inc.*, No. 02 Civ. 9586 (SAS), 2003 U.S. Dist. LEXIS 11224, at *7 (S.D.N.Y. June 27, 2003) ("Websites that permit information exchange between the defendant and viewers are deemed 'interactive,' and generally support a finding of

personal jurisdiction over the defendant."); *Thomas Publ'g Co. v. Indus. Quick Search*, 237 F. Supp. 2d 489, 492 (S.D.N.Y. 2002) ("If [defendant] wishes to operate an interactive website accessible in New York, there is no inequity in subjecting [defendant] to personal jurisdiction here. If [defendant] does not want its website to subject it to personal jurisdiction here, it is free to set up a passive website that does not enable [defendant] to transact business in New York."); *Hsin Ten Enterprise USA, Inc. v. Clark Enterprises*, 138 F. Supp. 2d 449, 456 (S.D.N.Y. 2000) ("Generally, an interactive website supports a finding of personal jurisdiction over the defendant."); *see also Allstar Marketing Group, LLC v._GB Housewear Store, et al.*, No. 17-cv-7596-SHS. Dkt. 22 (S.D.N.Y. Oct. 12, 2017) (finding personal jurisdiction over China-based Defendants operating User Accounts on the Digital Marketplaces); *Spin Master Ltd. and Spin Master, Inc. v. Alan Yuan's Store, et al.*, No. 17-cv-7422-DLC, Dkt. 19. (S.D.N.Y. Sept. 28, 2017) (finding personal jurisdiction over China-based Defendants operating User Accounts on the Digital Marketplaces); *Spin Master Ltd. and Spin Master, Inc. v. Amy & Benton Toys and Gifts Co., Ltd., et al.*, No. 17-cv-5845-VSB, Dkt. 17 (S.D.N.Y. Aug. 4, 2017) (finding personal jurisdiction over China-based Defendants operating User Accounts on the Digital Marketplaces); *Ontel Products Corp. v. Auto Mall et al.*, No. 17-cv-5190-AT, Dkt. 6 (S.D.N.Y. July 18, 2017) (finding personal jurisdiction over China-based Defendants operating User Accounts on the Digital Marketplaces); *Rovio Entertainment Ltd. and Rovio Animation OY v. Best Baby and Kid Store, et al.*, No. 17-cv-4884-KPF, Dkt. 3 (S.D.N.Y. June 28, 2017) (finding personal jurisdiction over China-based Defendants operating User Accounts on the Digital Marketplaces); *Ideavillage Products Corp. v. chinafocus et al.*, No. 17-cv-3894-RA, Dkt. 19 (S.D.N.Y. May 24, 2017) (finding personal jurisdiction over China-based Defendants operating User Accounts on the Digital Marketplaces); *Moose Toys Pty LTD et al. v. Guangzhou Junwei Trading Company d/b/a*

*Backgroundshop et al.*, No. 17-cv-2561-LAK, Dkt. 12 (S.D.N.Y. May 11, 2017) (finding personal jurisdiction over China-based Defendants operating User Accounts on the Digital Marketplaces); *Rovio Entertainment Ltd. and Rovio Animation OY v. Angel Baby Factory d/b/a Angelbaby_factory et al.*, No. 17-cv-1840-KPF, Dkt. 11 (S.D.N.Y. March 27, 2017) (finding personal jurisdiction over China-based defendants operating User Accounts on the Digital Marketplaces); *Ontel Products Corporation v. Airbrushpainting Makeup Store a/k/a Airbrushespainting et al.*, No. 17-cv-871-KBF, Dkt. 20 (S.D.N.Y. Feb. 6, 2017) (finding personal jurisdiction over China-based defendants operating User Accounts on the Digital Marketplaces); and *Ideavillage Products Corp. v. Bling Boutique Store, et al.*, No. 1:16-cv-09039-KMW, Dkt. 3 (S.D.N.Y. Dec. 8, 2016) (also finding personal jurisdiction over China-based defendants operating User Accounts on the Digital Marketplaces).

Likewise, courts in this Circuit have also exercised jurisdiction over defendants under § 302(a)(1) where such defendants regularly offer for sale and sell goods through online marketplaces, "even though Defendants do not control their [] 'storefront' or its interactivity to the same extent that they control their own highly interactive website." *Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15 Civ. 8459 (LGS), 2016 U.S. Dist. LEXIS 89149, at *7 (S.D.N.Y. July 8, 2016) (quoting *EnviroCare Techs., LLC v. Simanovsky*, No. 11-CV-3458(JS)(ETB), 2012 U.S. Dist. LEXIS 78088, at *8 (E.D.N.Y. June 4, 2012) (concluding that jurisdiction existed where defendants sold "allegedly infringing goods . . . online through [their] Amazon storefront and the goods were shipped to New York by Amazon")); *see also Allstar Marketing Group LLC v._GB Housewear Store, et al.*, No. 17-cv-7596-SHS Dkt. 22 (S.D.N.Y. Oct. 12, 2017); *Spin Master Ltd. and Spin Master, Inc. v. Alan Yuan's Store, et al.*, No. 17-cv-7422-DLC, Dkt. 19 (S.D.N.Y. Sept. 28, 2017); *Spin Master Ltd. and Spin Master, Inc. v. Amy &*

*Benton Toys and Gifts Co., Ltd., et al.*, No. 17-cv-5845-VSB, Dkt. 17 (.S.D.N.Y. Aug. 4, 2017) (S.D.N.Y. Aug. 4, 2017); *Ontel Products Corp. v. Auto Mall et al.*, No. 17-cv-5190-AT, Dkt. 6 (S.D.N.Y. July 18, 2017); *Rovio Entertainment Ltd. and Rovio Animation OY v. Best Baby and Kid Store, et al.*, No. 17-cv-4884-KPF, Dkt. 6 (S.D.N.Y. June 28, 2017); *Ideavillage Products Corp. v. chinafocus et al.*, No. 17-cv-3894-RA, Dkt. 19 (S.D.N.Y. May 24, 2017); *Moose Toys Pty LTD et al. v. Guangzhou Junwei Trading Company d/b/a Backgroundshop et al.*, No. 17-cv-2561-LAK, Dkt. 12 (S.D.N.Y. May 11, 2017); *Rovio Entertainment Ltd. and Rovio Animation OY v. Angel Baby Factory d/b/a Angelbaby_factory et al.*, No. 17-cv-1840-KPF, Dkt. 11 (S.D.N.Y. March 27, 2017*); Ontel Products Corporation v. Airbrushpainting Makeup Store a/k/a Airbrushespainting et al.*, No. 17-cv-871-KBF, Dkt. 20 (S.D.N.Y. Feb. 6, 2017); and *Ideavillage Products Corp. v. Bling Boutique Store, et al.,* No. 1:16-cv-09039-KMW, Dkt. 3 (S.D.N.Y. Nov. 21, 2016).   Jurisdiction is proper "for internet sellers who use an internet storefront like Amazon," when the Internet sellers are "commercial vendors who use it 'as a means for establishing regular business with a remote forum.'" *Lifeguard Licensing Corp.*, 2016 U.S. Dist. LEXIS 89149, at *8 (S.D.N.Y. July 8, 2016).

Here, the fact that Defendants have chosen to open their respective User Accounts for the purpose of selling Infringing Products on the Digital Marketplaces (all of which are notorious hotbeds for the sale of infringing products) (*see Arnaiz Dec.*, ¶ 4 and *Brennan Dec.*, ¶¶ 7-9) alone supports a finding that Defendants have intentionally used the Digital Marketplaces "as a means for establishing regular business with a remote forum." *EnviroCare Techs., LLC*, 2012 U.S. Dist. LEXIS 78088, at *10 (quoting *Boschetto v. Hansing*, 539 F.3d 1011, 1019 (9th Cir. 2008)). Moreover, the fact that, to the best of Plaintiffs' knowledge, Defendants, some of whom are self-described "manufacturers" and/or "trading companies" (*Brennan Dec.*, ¶ 18), are offering the

Infringing Products through the Digital Marketplaces exclusively in wholesale quantities and at significantly below-market prices (*see id.*), coupled with the fact that most of their User Accounts reflect multiple sales to consumers across the world (*See Arnaiz Dec.*, ¶¶ 16-18, *Ex. A*), including repeat sales to consumers in the U.S., which make up significant percentages of Defendants' total revenues (and are estimated in several cases to be in the millions of dollars) (*see id.*), confirms that Defendants are sophisticated sellers operating commercial businesses through the Digital Marketplaces such that they are subject to jurisdiction. *EnviroCare Techs., LLC*, 2012 U.S. Dist. LEXIS 78088, at *10 (citing *Malcolm v. Esposito*, 63 Va. Cir. 440, 446 (Cir. Ct. 2003) (finding jurisdiction over commercial "power sellers" with 213 sales on eBay who represented that they had local, national, and international eBay customers); *see also Dedvukaj v. Maloney*, 447 F. Supp. 2d 813, 818-23 (E.D. Mich. 2006) (finding jurisdiction where defendants used eBay and Amazon to "expand their market 'literally to the world' and 'avail[ed] themselves of the benefits of this greatly expanded marketplace.'").

It is highly likely that Defendants have shipped Infringing Products to consumers in New York based on the following: 1) all Defendants provided confirmation to NAL indicating that they ship Infringing Products to New York, 2) NAL completed an order form or checkout page for an order of Infringing Products from each and every Defendant through an account associated with a New York Address and/or provided a New York Address as the shipping address, 3) NAL received invoices issued by Defendants for the purchase of Infringing Products to be delivered to a New York Address, 4) all Defendants accept payment in U.S. dollars and 5) many Defendants have made their own representations regarding their recurrent sales of large quantities of Infringing Products to consumers in the U.S., often making up between twenty percent (20%) and fifty percent (50%) of such Defendants' total revenue and generating millions of dollars in

revenue. *See Arnaiz Dec.*, ¶¶ 8-18, *Ex.* A.

Nevertheless, whether a defendant physically shipped Infringing Products into New York is not determinative of whether personal jurisdiction exists, as courts in this Circuit examine a given defendant's online interactions with consumers in considering whether a particular defendant has transacted business in the forum state under § 302(a)(1). *See Rolex Watch, U.S.A., Inc. v. Pharel*, 2011 U.S. Dist. LEXIS 32249, at 6 (E.D.N.Y. Mar. 11, 2011) (finding personal jurisdiction over defendant, a resident of South Carolina, because he transacted business in New York by monitoring and responding to inquiries for counterfeit watches through websites accessible in New York).[5]  Plaintiffs, Plaintiffs' counsel and NAL have viewed Defendants' Infringing Products via their online User Accounts (*see Arnaiz Dec.*, ¶ 7; *Yanofsky Dec.*, ¶ 23 and *Brennan Dec.*, ¶ 15).  NAL then communicated with Defendants through their online User Account about the Infringing Products and the delivery of the Infringing Products to a New York Address[6] (*see Arnaiz Dec.*, ¶¶ 8-11, *Ex.* A), received invoices for the purchase of Infringing Products to be delivered to a New York Address (*see id.*, ¶ 14, *Ex.* A) and completed order forms or checkout pages for Infringing Products by providing a New York Address as the shipping address.[7]  *See id.*, ¶¶ 10-13, *Ex.* A.  Thus, Defendants' operation of their sophisticated

---

[5] *See also Hsin Ten Enter. United States*, 138 F. Supp. 2d at 461 (finding jurisdiction where a viewer of the defendant's website may purchase the defendant's product online, download an order form, download an application to become an "independent affiliate," and ask a representative questions online); *Citigroup Inc.*, 97 F. Supp. 2d at 565 (holding that jurisdiction existed where customers in New York could apply for loans online, print out an application, chat with an online representative, and e-mail questions and receive a response from online representative through the website).

[6] In some circumstances, courts in the Second Circuit have found that a party had "transacted business" based on telephone or internet communications alone (*see Skrodzki v. Marcello*, 810 F. Supp. 2d 501, 512-13 (E.D.N.Y. 2011)), and that, "[t]he offering for sale of even one copy of an allegedly infringing item, even if no sale results, is sufficient to give personal jurisdiction over the alleged infringer under N.Y. CPLR § 302(a), subd. 1, 2 and 3." *See Cartier v. Seah LLC*, 598 F. Supp. 2d 422, 425 (S.D.N.Y. 2009).

[7] Under case law of the Second Circuit, when analyzing personal jurisdiction in the Internet context, "traditional statutory and constitutional principles remain the touchstone of the inquiry", and while a website's interactivity, "may be useful" for analyzing personal jurisdiction 'insofar as it helps to decide whether the defendant 'transacts any business' in New York,'" ... "it does not amount to a separate framework for analyzing internet-based jurisdiction." *Best Van Lines, Inc.*, 490 F.3d at 252 (quoting *Best Van Lines, Inc. v. Walker*, No. 03 Civ. 6585 (GEL), 2004 U.S.

commercial operations, their offering for sale and/or selling of Infringing Products through their highly interactive User Accounts on the Digital Marketplaces, which generate millions of dollars in illicit revenues from consumers all over the world, including in the U.S., and NAL's completion of order forms and/or checkout pages, along with Defendants' own admissions that

Dist. LEXIS 7830, at *9 (S.D.N.Y. May 4, 2004) (citing *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W. D. Pa. 1997)). Sister circuits similarly rely on the traditional principles guiding the personal jurisdiction analysis when analyzing the same in the Internet context, namely the Eleventh Circuit (*see* e.g., *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1219-1224 (11th Cir. 2011) (criticizing the over-reliance on the sliding scale of interactivity analysis and instead applying a traditional personal jurisdiction analysis in an Internet case where the website was fully interactive); *see also Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1356-58 (11th Cir. 2013) (applying the traditional purposeful availment test in a case where defendant's fully interactive website was accessible in Florida, and was selling and distributing infringing goods through his website to Florida consumers)), and the Seventh Circuit (*see*, e.g., *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2010) (addressing the impact of a defendant's online activities upon the personal jurisdiction analysis and reiterating that, as with offline activities, the Court must focus upon the deliberate actions of the defendant within the State)), are instructive in considering whether the exercise of jurisdiction over Defendants in the instant action is appropriate under similar, if not identical facts. For example, courts in the Eleventh Circuit have routinely granted temporary restraining orders, preliminary injunctions and default judgments in online counterfeiting cases where no purchases of the counterfeit/infringing products were made, but the plaintiffs alleged and confirmed that each of the foreign defendants operated fully interactive commercial websites through which they advertised, promoted, offered for sale, and sold products bearing what the plaintiff determined to be counterfeit and infringing trademarks into the U.S., and in interstate commerce, in violation of the plaintiff's rights. *See* e.g., *Malletier*, 2016 U.S. Dist. LEXIS 93072, at *3; *Mycoskie v. 2016tomsshoessaleoutlet.us*, No. 16-61523-CIV-GAYLES, 2016 U.S. Dist. LEXIS 95963, at *4 (S.D. Fla. July 22, 2016); *Adidas AG v. 007adidasuk.com*, No. 15-61275-CIV-GAYLES, 2015 U.S. Dist. LEXIS 179020, at *8 (S.D. Fla. July 13, 2015); *Louis Vuitton Malletier, S.A. v. 2015shoplvhandbag.com*, No. 15-62531-CIV-BLOOM, 2015 U.S. Dist. LEXIS 181477, at *11 (S.D. Fla. Dec. 18, 2015); *Abercrombie & Fitch Trading Co. v. Abercrombieclassic.com*, No. 15-62579-CIV-ALTONAGA, 2015 U.S. Dist. LEXIS 179041, at *5 (S.D. Fla. Dec. 11, 2015); *Gucci Am., Inc. v. Gucc-Outlet.com*, No. 15-62165-CIV-GAYLES, 2015 U.S. Dist. LEXIS 181483, at *3-4 (S.D. Fla. Nov. 9, 2015); *Chanel, Inc. v. 2012leboyhandbag.com*, No. 15-61986-CIV-ZLOCH, 2015 U.S. Dist. LEXIS 177989, at *3 (S.D. Fla. Oct. 13, 2015); *Abercrombie & Fitch Trading Co. v. Abercrombieandfitchdk.com*, No. 15-62068-CIV-BLOOM, 2015 U.S. Dist. LEXIS 179117, at *5 (S.D. Fla. Oct. 7, 2015); *Malletier v. 2015louisvuittons.com*, No. 15-61973-CIV-BLOOM, 2015 U.S. Dist. LEXIS 181452, at *11 (S.D. Fla. Sep. 29, 2015); *Chanel, Inc. v. Chanelsstore.com*, No. 15-61156-CIV, 2015 U.S. Dist. LEXIS 179101, at *5 (S.D. Fla. Aug. 31, 2015). Similarly, the Seventh Circuit, in *Illinois v. Hemi Group LLC*, held that it had personal jurisdiction over the foreign defendants because they operated a nationwide business model where they intentionally created and operated several commercial, interactive websites to offer products for sale and allow online orders from Illinois residents, specifically noting that the "[defendants] maintained commercial websites through which customers could purchase cigarettes, calculate their shipping charges using their zip codes, and create accounts," and as a result, the "[defendants] stood ready and willing to do business with Illinois residents". 622 F.3d 754, 756 (7th Cir. 2010); *see also Monster Energy Co. v. Chen Wensheng*, 136 F. Supp. 3d 897, 906 (N.D. Ill. 2015) (holding that defendants had "expressly aimed" their actions at the state, making specific personal jurisdiction proper even without a sale made to an Illinois resident, because in addition to intentionally creating and operating commercial, fully interactive AliExpress.com Internet stores through which consumers can purchase counterfeit Monster Energy Products, the defendants had affirmatively selected a shipping option to ship counterfeit products to the United States, including to Illinois residents, and the plaintiffs' exhibits showed that the named defendants had specifically offered to sell particular counterfeit products to individuals with Illinois shipping addresses and provided PayPal account number for the buyer to make the payment for the item, and as a result, the defendants expressly elected to do business with the residents of all fifty states, including Illinois).

they do in fact ship Infringing Products to a New York Address, unequivocally establishes that Defendants conduct business in this district and the claims in this suit arise from Defendants' business dealings and transactions with consumers in New York.[8]  *See Arnaiz Dec.*, ¶¶ 10-18, *Ex. A* and *Brennan Dec.*, ¶¶ 15-18.

### 2. Defendants are Subject to Personal Jurisdiction Under N.Y. C.P.L.R. § 302(a)(3)

In order to establish jurisdiction under N.Y. C.P.L.R. § 302(a)(3)(ii), a plaintiff must show that 1) the defendant committed a tortious act outside of New York, 2) the tortious act caused an injury in New York, 3) the defendant expected or should reasonably have expected the tortious act to have consequences in New York and 4) the defendant derived substantial revenue from interstate or international commerce.  *See Energy Brands Inc.*, 571 F. Supp. at 470 (citing N.Y. C.P.L.R. § 302(a)(3) (McKinney)).

Here, by advertising, offering for sale, selling, distributing and shipping wholesale and retail products (all of which originate from China) directly to consumers across the world, including consumers located throughout the U.S. and specifically in New York, Defendants have committed tortious acts, as alleged herein, outside of New York, thus directly giving rise to the claims asserted in the instant action.[9]  *See Arnaiz Dec.*, ¶¶ 7-15, *Ex.* A; *see also Etna Products Co. v. Dacofa Trading Co.*, 1992 U.S. Dist. LEXIS 2924 (S.D.N.Y. Mar. 9, 1992) (noting that copyright infringement and trade dress infringement are commercial torts committed where the infringing goods are sold and/or offered for sale).

---

[8] Plaintiff respectfully submits that the Court has jurisdiction pursuant to Fed. R. Civ. P. 4(k)(2), which "provides for jurisdiction over a defendant if a claim arises under federal law, if the defendant is not subject to jurisdiction of the courts of general jurisdiction of any state, and if the exercise of jurisdiction is consistent with the Constitution and laws of the United States." *Lechner v. Marco-Domo Intnationales Interieur GmbH*, No. 03 Civ. 5664 (JGK), 2005 U.S. Dist. LEXIS 4022, *8 (S.D.N.Y. Mar. 10, 2005).

[9] In some instances, Defendants' Infringing Listings show North America as one of Defendants' top markets, often making up between twenty percent (20%) and fifty percent (50%) of Defendants' total revenue, and/or indicate Defendants' recent transactions to buyers in the United States. Several of the Defendants' User Accounts reflect multiple sales to consumers across the world, including repeat sales to consumers in the United States, which make up significant percentages of Defendants' total revenues (and are estimated, in several cases, to be in the millions of dollars). *See Arnaiz Dec.*, ¶¶ 16; *Ex.* A.

"Courts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a 'situs-of-injury' test." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. N.Y. 2001). Courts in this district have found that "in trademark infringement cases, the tort occurs where the passing off occurs, that is, where the customer purchases the defendant's goods in the mistaken belief that they are the trademark owner's products." *Energy Brands Inc.*, 571 F. Supp. at 467 (finding injury in New York in an action for trade dress infringement, noting that injury within New York encompasses "'harm to a business in the New York market through lost sales or lost customers,'" which "is satisfied by harm and threatened harm resulting from actual or potential confusion and deception of internet users in New York State.") (internal citations omitted). Further, this Court has often found that "in the case of commercial torts, the situs of injury is "the place where the plaintiff lost business." *A + E TV Networks, LLC v. Wish Factory*, 2016 U.S. Dist. LEXIS 33361, 16 (S.D.N.Y. 2016).

Here, it is clear that injury occurred within New York. First, Plaintiffs advertise, market, promote, distribute, display, offer for sale and/or sell the Fingerlings Products in New York. *See Yanofsky Dec.*, ¶ 6, 14. Second, Defendants' Infringing Listings on the Digital Marketplaces resulted in consumers throughout the U.S., and specifically in New York, purchasing Infringing Products. *See Arnaiz Dec.*, ¶ 7-15; *Ex.* A. As a direct result of Defendants' infringing actions, Plaintiffs suffered harm in New York through lost sales in New York and lost New York consumers. *See Yanofsky Dec.*, ¶ 28.

In determining whether a defendant "expected or should reasonably have expected" its tortious act to "have consequences in New York," courts have examined whether defendant made a 'discernible effort to directly or indirectly serve the New York market.'" *DH Servs., LLC v. Positive Impact, Inc.*, 2014 U.S. Dist. LEXIS 14753, at *34, *37 (S.D.N.Y. 2014) (internal

citations omitted).  "To ensure that the provision is construed in a manner consistent with federal due process requirements, New York courts require 'tangible manifestations of a defendant's intent to target New York, or . . . concrete facts known to the nondomiciliary that should have alerted it to the possibility of being brought before a court in the Southern District of New York.'"  *Id*, at *37.  Further, "New York courts will assess whether the facts demonstrate that defendant should have been aware that its product would enter the New York market."  *Energy Brands Inc.*, 571 F. Supp. at 468.  Here, Defendants most certainly should have expected their infringing actions to have consequences in New York and been well aware of the fact that the Infringing Products would enter the New York market, given that NAL has 1) communicated with Defendants through their online User Accounts about the Infringing Products and delivery of the same to the New York Address, 2) received invoices for the purchase of Infringing Products to be delivered to a New York Address and 3) completed order forms or checkout pages for Infringing Products which provide the New York Address as the shipping address.  *See Arnaiz Dec.*, ¶¶ 8-15, *Ex.* A.

Finally, although "there is no bright-line rule regarding when a specific level of revenue becomes substantial for purposes of 302(a)(3)(ii)" (*Energy Brands Inc.*, 571 F. Supp. at 468), considering that all Defendants accept payment in U.S. dollars and many Defendants have made representations regarding their recurrent sales of large quantities of Infringing Products to consumers in the U.S. (*see Arnaiz Dec.*, ¶¶ 16-18, *Ex.* A), often making up between twenty percent (20%) and fifty percent (50%) of such Defendants' total revenue and generating millions of dollars in revenue, there is no doubt that Defendants derive substantial revenue from U.S. interstate commerce through online sales. *See id.*

### 3.  Exercising Personal Jurisdiction Over Defendants Comports With Due Process

The assertion of personal jurisdiction over Defendants also comports with the Due

Process Clause of the U.S. Constitution, as Defendants have "certain minimum contacts … such that maintenance of th[is] suit does not offend 'traditional notions of fair play and substantial justice.'" *Calder v. Jones*, 465 U.S. 783, 788 (1984) (quoting *Milliken v. Meyer*, 311 U.S. 457 (1940)).   Defendants intentionally directed activity towards the New York market, thereby purposefully availing themselves of "the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (U.S. 1985); *see Best Van Lines, Inc.*, 490 F.3d at 243 ("In the language of minimum contacts, when the defendants committed 'their intentional, and allegedly tortious, actions expressly aimed at California, they must have reasonably anticipated being hailed into court there.'") (internal quotations omitted); *see also Arnaiz Dec.*, ¶¶ 8-18, *Ex.* A and *Brennan Dec.*, ¶¶ 15-17.   Moreover, "as a practical matter, the Due Process Clause permits the exercise of jurisdiction in a broader range of circumstances of N.Y. C.P.L.R. § 302, and a foreign defendant meeting the standards of § 302 will satisfy the due process standard." *Energy Brands Inc.*, 571 F. Supp. 2d at 469.   Accordingly, Plaintiffs respectfully submit that this Court has personal jurisdiction over Defendants in this action.

**B.   PLAINTIFFS ARE ENTITLED TO AN *EX PARTE* TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

An *ex parte* order is essential in this case to prevent immediate and irreparable injury to Plaintiffs.   Rule 65(b) of the Federal Rules of Civil Procedure provides, in pertinent part, that a temporary restraining order may be granted without written or oral notice to the opposing party or that party's counsel where "it clearly appears from the specific facts shown by affidavit . . . that immediate and irreparable injury, loss or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition." Fed. R. Civ. P. 65(b).   Section 34 of the Lanham Act expressly authorizes this Court to issue *ex parte* restraining orders "with

respect to a violation [of the Act] that consists of using a counterfeit mark in connection with the sale, offering for sale, or distribution of goods." 15 U.S.C. § 1116(d)(1)(a). Congress' purpose for enacting such *ex parte* remedies was to ensure that courts were able to effectively exercise their jurisdiction in counterfeiting cases and to prevent counterfeiters given prior notice from disappearing or quickly disposing of infringing inventory or records relating to their counterfeiting and illegal actions. *See* Senate-House Joint Explanatory Statement on trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, at 12080 (Oct. 10, 1984).

Once a violation of the Lanham Act is demonstrated, the issuance of an *ex parte* order is appropriate upon showing that: (i) the plaintiff will provide adequate security; (ii) any order other than an *ex parte* order is not adequate to achieve the purposes of 15 U.S.C. § 1114; (iii) the plaintiff has not publicized the requested *ex parte* order; (iv) the plaintiff is likely to succeed on showing that defendants are using counterfeit marks; (v) an immediate and irreparable injury will occur if such *ex parte* order is not granted; (vi) the materials to be seized will be located at the place identified in the application; (vii) the harm to the plaintiff in denying the application outweighs the harm to defendants in granting the order and (viii) if prior notice was given, defendants would destroy, move, hide or otherwise make such matter inaccessible to the court. *See* 15 U.S.C. § 1116(d)(4)(B). As discussed in this Application, Plaintiffs meet each of the relevant criteria for the issuance of an *ex parte* temporary restraining order under the Lanham Act.[10] *See Yanofsky Dec.* and *Brennan Dec.*

"Courts in this Circuit have not hesitated to exercise [their] authority [to grant an *ex parte* order] in infringement cases in which there is a danger the defendants will destroy, conceal, or

---

[10] Plaintiff has expressed its willingness to provide security in conjunction with the *ex parte* relief it seeks. *See* [Proposed] Order, filed herewith. Plaintiff has certified that it has not publicized this Application. *See Yanofsky Dec.*, ¶ 30. Also, since Defendants' location and the location of the Counterfeit Products are unclear, Plaintiff is not requesting a seizure order in this Application. *See Brennan Dec.*, ¶¶ 21-22.

transfer counterfeit goods." *Moose Toys Pty, Ltd. v. Thriftway Hylan Blvd. Drug Corp.*, No. 15-CV-4483 (DLI)(MDG), 2015 U.S. Dist. LEXIS 105912, at *8 (E.D.N.Y. Aug. 6, 2015).[11] Moreover, federal courts have long recognized that civil actions against counterfeiters - whose very business is built around the deliberate misappropriation of rights and property belonging to others - present special challenges that justify proceeding on an *ex parte* basis. *See Time Warner Entertainment Co., L.P. v. Does*, 876 F. Supp. 407, 410-11 (E.D.N.Y. 1994).

An *ex parte* temporary restraining order is particularly warranted in cases involving offshore counterfeiters, concealing their identities and engaging in unlawful and harmful counterfeiting activities through the use of the Digital Marketplaces to avoid revealing their actual locations and identities, such as Defendants here. *See Brennan Dec.*, ¶¶ 11-13, 20-21. Defendants, who are located in China and operate their businesses exclusively over the Internet, are knowingly and willfully offering for sale and selling Counterfeit Products through their User Accounts on the Digital Marketplaces. *See Arnaiz Dec.*, ¶ 6-7, Ex. A; *Yanofsky Dec.*, ¶ 21 and *Brennan Dec.*, ¶¶ 3, 15-16. Given the propensity for sellers on the Digital Marketplaces to use aliases, false addresses and other incomplete identification information to avoid detection, if Defendants are put on notice of the filing of this Application, it is likely that Defendants will attempt to circumvent the temporary restraining order, by disappearing, destroying any evidence of their counterfeiting activities and draining their financial accounts. *See Brennan Dec.*, ¶¶ 11-

---

[11] *See also Allstar Marketing Group LLC v._GB Housewear Store, et al.*, No. 17-cv-7596-SHS, Dkt. 22 (S.D.N.Y. Oct. 12, 2017); *Spin Master Ltd. and Spin Master, Inc. v. Alan Yuan's Store, et al.*, No. 17-cv-7422-DLC, Dkt. 19. (S.D.N.Y. Sep. 28, 2017); *Spin Master Ltd. and Spin Master, Inc. v. Amy & Benton Toys and Gifts Co., Ltd., et al.*, No. 17-cv-17-5845-VSB, Dkt. 17 (S.D.N.Y. Aug 4. 2017); *Ontel Products Corp. v. Auto Mall et al.*, No. 17-cv-5190-AT, Dkt. 6 (S.D.N.Y. July 18 2017); *Rovio Entertainment Ltd. and Rovio Animation OY v. Best Baby and Kid Store, et al.*, No. 17-cv-4884-KPF, Dkt. 3 (S.D.N.Y. June 28, 2017); *Ideavillage Products Corp. v. chinafocus et al.*, No. 17-cv-3894-RA, Dkt. 19 (S.D.N.Y. May 24, 2017); *Moose Toys Pty LTD et al. v. Guangzhou Junwei Trading Company d/b/a Backgroundshop et al.*, No. 17-cv-2561-LAK, Dkt. 12 (S.D.N.Y. May 11, 2017); *Rovio Entertainment Ltd. and Rovio Animation OY v. Angel Baby Factory d/b/a Angelbaby_factory et al.*, No. 17-cv-1840-KPF, Dkt. 11 (S.D.N.Y. March 27, 2017); *Ontel Products Corporation v. Airbrushpainting Makeup Store a/k/a Airbrushespainting et al.*, No. 17-cv-871-KBF, Dkt. 20 (S.D.N.Y. Feb. 6, 2017); and *Ideavillage Products Corp. v. Bling Boutique Store, et al.*, No. 1:16-cv-09039-KMW, Dkt. 9 (S.D.N.Y. Nov. 21, 2016).

13, 20-21.

In addition to Defendants' likely attempts to hide evidence of their counterfeiting activities, if Defendants are given notice of this Application prior to providing the Financial Institutions and Third Party Service Providers with the time necessary to freeze Defendants' Assets and/or Defendants' Financial Accounts, it is highly likely that Defendants will move and/or deplete Defendants' Assets and/or Defendants Financial Accounts before the Financial Institutions and Third Party Service Providers can comply with the temporary restraining order. *See id.,* ¶ 20. Further, if provided with prior notice of this Application, Defendants are also likely to simply open new accounts or User Accounts on the Digital Marketplaces under new or different names and continue to offer for sale and sell Counterfeit Products with little to no consequence. *See id.*, ¶ 9. Thus, in light of the covert nature of Defendants and their unlawful, infringing and counterfeiting activities, an order other than an *ex parte* temporary restraining order would be an exercise in futility. The immediate and irreparable harm to Plaintiffs' business and reputation, as well as to the goodwill associated with the Fingerlings Marks and Fingerlings Works in denying its Application for an *ex parte* temporary restraining order, greatly outweighs the harm to Defendants' interests in continuing to offer for sale and sell Counterfeit Products.[12] *See Yanofsky Dec.,* ¶ 28.

It is the well settled law of this circuit that, "[t]o obtain a preliminary injunction, a plaintiff must establish: '(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly' in its favor.'" *Louis Vuitton Malletier v. Burlington Coat Factory*

---

[12] *See supra* fn. 1 (collecting cases granting an *ex parte* temporary restraining order in situations where harm to plaintiffs far outweighed harm to defendants.).

*Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005) (quoting *Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000)).  The "standards which govern consideration of an application for a temporary restraining order... are the same standards as those which govern a preliminary injunction." *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992).  As detailed below, Plaintiffs have met the standard for a preliminary injunction, and accordingly, a temporary restraining order should also issue against Defendants.

### 1. Plaintiffs Will Suffer Irreparable Harm in the Absence of an Injunction Leaving Plaintiffs with No Adequate Remedy at Law

Defendants' infringing activities must be stopped immediately in order to prevent any further harm to Plaintiffs.  Not only do Plaintiffs stand to suffer lost profits as a result of Defendants' competing substandard Counterfeit Products, but it destroys the inherent value of the Fingerlings Marks, it impairs Fingerlings' reputation for providing quality products, it dilutes Fingerlings' brand and goodwill and it negatively affects Plaintiffs' relationships with its current customers (both retail sellers and ultimate consumers) and its ability to attract new customers. *See Yanofsky Dec.*, ¶ 28.  While courts may no longer presume irreparable harm upon a finding of infringement (*Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010)), "[i]rreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F.Supp.2d 515, 540 (S.D.N.Y. 2011); *see also NYP Holdings v. New York Post Pub. Inc.*, 63 F. Supp. 3d 328, 341 (S.D.N.Y. 2014) ("[A]lthough irreparable harm may not be presumed upon a showing of a likelihood of success, irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . Thus, it will

often be the case that a party's demonstration of a likelihood of success on a trademark claim will also show a threat of irreparable harm." (citing *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 393; *Salinger*, 607 F.3d at 80)). Further, a plaintiff may still demonstrate that "on the facts of the case, the failure to issue an injunction would actually cause irreparable harm." *Salinger*, 607 F.3d at 82 (citing *eBay*, 547 U.S. at 393); *see also WPIX, Inc. v. IVI, Inc.*, 691 F.3d 275, 285-286 (2d Cir. 2012) (upholding the district court's finding of irreparable harm in the context of a copyright infringement claim when the plaintiffs showed that the defendants' actions substantially diminished the value of the plaintiff's copyrighted work because "plaintiffs' losses would be difficult to measure and monetary damages would be insufficient to remedy the harms" and defendants "would be unable to pay damages should plaintiffs prevail").

Further, it has also been recognized in this Circuit that irreparable harm sufficient to warrant a preliminary injunction exists where defendant injected counterfeit versions of a plaintiffs' products into the market. *See CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 145 (E.D.N.Y. 2011). Here, Plaintiffs have invested considerable time, money and effort to develop goodwill among customers, and to create instantly recognizable products that have become popular worldwide, and Defendants have sold substandard Counterfeit Products that look remarkably similar, if not identical, to the Fingerlings Products and which embody, bear and/or incorporate the Fingerlings Marks and/or Fingerlings Works and/or identical or confusingly and/or substantially similar marks and/or works, thereby resulting in lost sales and impairing Plaintiffs' reputation that they have achieved through the considerable time and efforts they expended.[13] *See Yanofsky Dec.*, ¶ 28 and *Brennan Dec.*, ¶¶ 14-16.

Moreover, Defendants are denying Plaintiffs of their fundamental right to control the

---

[13] *Mitchell Grp. USA LLC v. Udeh*, No. 14-cv-5745, 2015 U.S. Dist. LEXIS 18801, at *8 (E.D.N.Y. Feb. 17, 2015) (internal citations omitted).

quality of the goods sold under their Fingerlings Marks. *See Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009) (internal quotation marks omitted) (affirming district court's grant of preliminary injunction) (quoting *El Greco*, 806 F.2d at 395) ("[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark."). Defendants are offering their substandard Counterfeit Products, in wholesale quantities, at significantly below-market prices with which Plaintiffs cannot compete given the high-quality materials and construction necessary to manufacture the Fingerlings Products. *See Yanofsky Dec.*, ¶ 25; *Brennan Dec.*, ¶¶ 19-21; *Zino Davidoff SA*, 71 F.3d 244 (holding that irreparable harm is caused to a trademark owner who cannot control the quality of their products because "a higher incidence of substantial sales of counterfeit goods, which are invariably non-conforming and inferior" would "harm [Plaintiffs'] reputation and diminish the value of its trademark."); *see also Mint, Inc. v. Iddi Amad*, No. 10 Civ. 9395 (SAS), 2011 U.S. Dist. LEXIS 49813, at *9 n.23 (S.D.N.Y. May 9, 2011) ("the loss of pricing power resulting from the sale of inexpensive 'knock-offs' is, by its very nature, irreparable) (citing *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008) (citing *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (likelihood of price erosion and loss of market position are evidence of irreparable harm); *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996) (loss of market opportunities cannot be quantified or adequately compensated and is evidence of irreparable harm)).

Also, because Defendants' substandard Counterfeit Products are virtually indistinguishable from the Fingerlings Products, not only could any injury to consumers that results from such consumers' use of Defendants' substandard Counterfeit Products be attributed

to Plaintiffs, thereby causing irreparable harm to Plaintiffs in the form of unquantifiable lost sales, loss of goodwill and loss of control of their reputation with Authorized Licensees, retailers and consumers, but Plaintiffs would also potentially be exposed to legal liability for any such injury to consumers. *See Yanofsky Dec.*, ¶ 27 and *Brennan Dec.*, ¶¶ 14-17. Thus, this factor weighs heavily in Plaintiffs' favor.

### 2. **Plaintiffs are Likely to Prevail on the Merits of their Lanham Act Claims**

In order to establish a likelihood of success on trademark counterfeiting and infringement claims, a plaintiff must show: (1) that its marks are valid and entitled to protection, and (2) that defendants' use of plaintiff's marks is likely to cause confusion. *See Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010).

As a preliminary matter, the U.S. Trademark Registration certificates submitted in conjunction with this application provide *prima facie* evidence of both the validity of the Fingerlings Marks as well as Plaintiffs' ownership of the same. *See Yanofsky Dec.*, ¶ 11, *Ex.* C; 15 U.S.C. § 1057(b).

Generally, a proper likelihood of confusion inquiry involves an analysis of the factors set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*: (1) the strength of the plaintiff's mark; (2) the similarity between the two marks; (3) the competitive proximity of the parties' products in the marketplace; (4) the likelihood that the senior user will bridge the gap, if any, between the products; (5) evidence of actual confusion; (6) the defendant's bad faith; (7) the quality of the defendant's product and (8) the sophistication of the relevant consumer group. 287 F.2d 492, 495 (2d Cir. 1961). Yet, "where counterfeit marks are involved, it is not necessary to conduct the step-by-step examination of each *Polaroid* factor because counterfeit marks are inherently confusing." *Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 383 (S.D.N.Y.

2010) (quoting *Burberry Ltd. v. Euro Moda, Inc.*, No. 08 Civ. 5781 (CM), 2009 U.S. Dist. LEXIS 53250, 2009 WL 1675080, at *5 (S.D.N.Y. June 10, 2009) (internal citations omitted)); *see also Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003). Instead, "[t]he court need only determine the more fundamental question of whether there are items to be confused in the first place -- that is, whether the items at issue . . . are, in fact, counterfeit and whether [d]efendants sold those items, or offered those items for sale." *Fendi Adele S.R.L.*, 696 F. Supp. 2d at 383 (internal citations omitted). "Sellers bear strict liability for violations of the Lanham Act." *Id.*   Regardless, even if a *Polaroid* analysis were necessary, a straightforward application of the test clearly demonstrates that a likelihood of confusion exists in this case.

Finally, because Plaintiffs have shown that they are likely to prevail on their trademark counterfeiting and trademark infringement claims, Plaintiffs have also shown that they likely will prevail on their claims for false designation of origin, passing off and unfair competition. *See Richemont N. Am., Inc. v. Linda Lin Huang*, No. 12 Civ. 4443 (KBF), 2013 U.S. Dist. LEXIS 136790, at *14-16 n.15 (S.D.N.Y. Sep. 24, 2013) (quoting *New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979)); *Le Book Publ'g, Inc. v. Black Book Photography, Inc.*, 418 F. Supp. 2d 305, 312 (S.D.N.Y. 2005) (quoting *New West Corp. v. NYM Co. of California, Inc.,* 595 F.2d 1194, 1201 (9th Cir. 1979)) ("'[W]hether we call the violation infringement, unfair competition or false designation or origin, the test is identical.'").

### a)  *The Fingerlings Marks are Strong and Distinctive*

In determining the strength of a mark, courts look to: "(1) inherent strength, resulting from the mark's degree of inherent distinctiveness, usually measured on the ladder ranging from unprotectable generic marks to arbitrary, fanciful marks that enjoy the broadest protection, and (2) acquired strength, reflecting the degree of consumer recognition the mark has achieved."

*Tcpip Holding Co. v. Haar Communs. Inc.*, 244 F.3d 88, 100 (2d Cir. 2001).   The Fingerlings Marks are suggestive as applied to the goods with which they are associated, and have acquired distinctiveness from being prominently used in connection with the Fingerlings Products, which have achieved worldwide recognition and fame. *See Yanofsky Dec.*, ¶ 14, *Ex.* A.   Additionally, Plaintiffs' federal trademark registrations for the Fingerlings Marks further demonstrate the strength of the same. *See id.*; *see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986) ("[R]egistered trademarks are presumed to be distinctive and should be afforded the utmost protection").   Likewise, the Fingerlings Marks are suggestive as applied to the goods with which they are associated, as each "requires imagination, thought and perception to reach a conclusion as to the nature of the goods," and thus, the Fingerlings Marks are inherently distinctive and are thereby entitled to trademark protection "without proof of secondary meaning." *Stix Prods., Inc. v. United Merchants & Mfrs., Inc.*, 295 F. Supp. 479, 488 (S.D.N.Y. 1968); *see also Thompson Medical Co., v. Pfizer Inc.*, 753 F.2d 208, 216 (2d Cir. 1985); and *Bernard v. Commerce Drug Co.*, 774 F. Supp. 103 (E.D.N.Y. 1991) (applying the aforementioned standards in the context of an unregistered trademark).   Thus, this factor weighs in Plaintiffs' favor.

### b) *Defendants' Counterfeit Products and Marks are Virtually Identical to the Fingerlings Products and Fingerlings Marks*

Defendants have applied identical copies of the Fingerlings Marks to their substandard, Counterfeit Products and/or used identical copies of the Fingerlings Marks in marketing and promoting their substandard, Counterfeit Products at Defendants' User Accounts; as such, this factor weighs in favor of Plaintiffs. *See Arnaiz Dec.*, ¶¶ 6-7, *Ex.* A; *Yanofsky Dec.*, ¶¶ 21, 23 and *Brennan Dec.*, ¶¶ 15-17.   Defendants' Counterfeit Products are clearly designed to look as much like the Fingerlings Products as possible, without the quality and workmanship of the Fingerlings

Products.  *See Yanofsky Dec.*, ¶ 27; *Brennan Dec.*, ¶¶ 15; *see also Rado Watch Co. v. ABC, Co.*, No. 92 Civ. 3657 (PKL), 1992 U.S. Dist. LEXIS 8356, *11 (S.D.N.Y. 1992) (finding that the similarity of the marks weighed heavily in plaintiff's favor where it is "exceedingly difficult" to distinguish between authentic and infringing goods, "even in a side-by-side comparison").  Only minor differences exist between the Counterfeit Products and the Fingerlings Products, which have no bearing on a finding of likelihood of confusion.  *See Arnaiz Dec.*, ¶¶ 6-7, *Ex.* A; *Yanofsky Dec.*, ¶ 23 and *Brennan Dec.*, ¶¶ 15-17.; *see also Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1004-1005 (2d Cir. 1997) (holding that the test for confusion is "whether they create the same general overall impression such that a consumer who has seen" the authentic product would, when seeing the infringing product, be confused).  Further, courts do "not look with much favor on the businessman who, out of the wealth of words available, chooses as a trademark one which comes as close as he dares to a well-known mark on the identical product."  *A. T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir. 1972).

### c) *Defendants' Counterfeit Products Directly Compete with the Fingerlings Products and There is No Gap to Bridge*

In considering the proximity of the products in the market, the concern is "competitive proximity," meaning "whether and to what extent the two products compete with each other." *Cadbury Beverages Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996).  In assessing the proximity of the parties' products, courts "look to the nature of the products themselves and the structure of the relevant market. Among the considerations germane to the structure of the market are the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold." *Id.* (citations and internal quotations omitted).  "[T]he closer the secondary user's goods are to those the consumer has seen

marketed under the prior user's band, the more likely that the consumer will mistakenly assume a common source." *Virgin Enterprises v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2003). In this case, the class of customers for both the Counterfeit Products and the Fingerlings Products are the same retail consumers, so this factor weighs in favor of Plaintiffs.

Further, where, as here, Defendants are offering for sale and selling products that are virtually identical in kind, but not in quality to the Fingerlings Products, bearing counterfeit and/or infringing marks in the same class of goods under which Plaintiffs sell their Fingerlings Products, they are already in competitive proximity and there is no "gap" to bridge. *See Arnaiz Dec.*, ¶¶ 6-7, Ex. A; *Yanofsky Dec.*, ¶ 23; *Brennan Dec.*, ¶¶ 15-17; *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (This factor "is irrelevant . . . where . . . the two products are in direct competition with each other.")); *see also Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005) (concluding that "[b]ecause . . . [the] products are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis"); and *Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*, No. 00-CV-5304 (SJ), 2004 U.S. Dist. LEXIS 10426, *15-16 (E.D.N.Y. 2004) (citations omitted) ("Where the products are competitive, there is no gap to bridge and the likelihood of confusion is greater.").

### d) *Actual Confusion Can Be Inferred Between Defendants' Counterfeit Products and the Fingerlings Products*

Seeing as Defendants are offering for sale and/or selling counterfeit versions of the Fingerlings Products under one or more of the Fingerlings Marks, or a confusingly similar mark, actual confusion can be inferred. *See Arnaiz Dec.*, ¶¶ 6-7, Ex. A; *Yanofsky Dec.*, ¶ 23 and *Brennan Dec.*, ¶¶ 15-17, Ex. A. Notwithstanding, Plaintiffs do not need to prove actual confusion, only a likelihood of confusion to obtain equitable relief. *See Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC*, 553 F. Supp. 2d 201, 206 (E.D.N.Y. 2008)

(quoting *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir. 1981)) ("To obtain an injunction in a trademark case the plaintiff need show 'only a likelihood of confusion or deception … in order to obtain equitable relief.'").

### e) *Defendants Acted in Bad Faith*

Given that Defendants' choice of marks, which are virtually identical to the Fingerlings Marks and used in connection with the offering for sale and/or sale of virtually identical products, it can be presumed that Defendants intended to trade off of the goodwill and reputation of Plaintiffs, their Fingerlings Products and theur Fingerlings Marks.   *See Arnaiz Dec.*, ¶ 6, *Ex.* A; *Yanofsky Dec.*, ¶ 28 and *Brennan Dec.*, ¶ 18.; *see also Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 132 (S.D.N.Y. 1993) ("When a company appropriates an identical mark that is well known and has acquired a secondary meaning, an inference can be drawn that the company intends to capitalize on the goodwill and reputation of the mark as well as any confusion that might result concerning the common origin of that mark and the senior user's product.").[14] If Defendants' counterfeiting and infringing actions are found to be willful, "likelihood of confusion will be presumed as a matter of law." *N.Y. State Soc'y of CPA's v. Eric Louis Assocs.*, 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999).

---

[14] *See also Toys "R" Us, Inc.*, 559 F. Supp. at 1199 (citing *E.I. duPont de Nemours & Co. v. Yoshida International, Inc.*, 393 F. Supp. 502, 514 (E.D.N.Y. 1975)) ("On the assumption that a businessman will ordinarily act to his commercial advantage, and that the attraction of an established business' good will to the newcomer's product is such an advantage, the inference to be drawn from imitation is the imitator's own expectation of confusion as to the source of origin of his product. Where, as here, there is little to distinguish the marks themselves and the prior mark is a long-established one which the newcomer was aware, doubts about intent are resolved against the newcomer, and a reasonable explanation of its choice is essential to establish lack of intent to deceive."); *Gucci America, Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060, 1065 (S.D.N.Y. 1991) ("Where the evidence "shows or requires the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit.") (internal citation omitted).

### f) *Defendants' Counterfeit Products Are of Inferior Quality*

The Fingerlings Products are manufactured with high quality materials. *See Yanofsky Dec.* ¶ 25. Plaintiffs have neither authorized Defendants' use of the Fingerlings Marks or confusingly similar marks in connection with the Counterfeit Products nor approved or tested Defendants' Counterfeit Products being offered for sale and/or sold under or in connection with the Fingerlings Marks and/or confusingly similar marks. *See Yanofsky Dec.* ¶ 23. Hence, Defendants have encroached on Plaintiffs' right to control the quality of the goods manufactured and sold under their Fingerlings Marks. *See Polymer Technology Corp. v. Mimran*, 975 F.2d 58, 62 (2d Cir. 1992) (quoting *El Greco Leather Products Co. v. Shoe World, Inc.,* 806 F.2d 392, 395 (2d Cir. 1986), *cert. denied,* 484 U.S. 817, 98 L. Ed. 2d 34, 108 S. Ct. 71 (1987)) ("'One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark . . . the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain'"). In light of the above, this factor further supports a finding of likelihood of confusion.

### g) *The Sophistication of Purchasers*

"Where the purchasers of a products are highly trained professionals, they know the market and are less likely than untrained consumers to be misled or confused by the similarity of different marks." *Virgin Enters. Ltd. v. Nawab,* 335 F.3d 141, 151 (2d Cir. 2003). In contrast, ordinary "retail customers," (*i.e.,* the consumers of Plaintiffs' and Defendants' products), "are not expected to exercise the same degree of care as professional buyers, who are expected to have greater powers of discrimination." *Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261, 268-269 (E.D.N.Y. 2011) (citing *Virgin Enterprises*, 335 F.3d at 151 (quoting district court)). Thus, this factor favors Plaintiffs' likelihood of success on the merits.

### 3.  **Plaintiffs are Likely to Prevail on their Copyright Act Claims**

Under 17 U.S.C. § 501(a), in order to show likelihood of success on the merits for a copyright infringement claim, a given plaintiff must show: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011) (quoting *Feist Publ'ns, Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 361 (1991)).  As detailed below, Defendants have infringed upon the Fingerlings Works.

### h)  *Plaintiffs own Valid Copyrights in their Fingerlings Works*

With respect to ownership, "[a] certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright." *Mint, Inc.*, 2011 U.S. Dist. LEXIS 49813, at *6; *see also* 17 U.S.C. § 410(c).  Thus, Plaintiffs' certificates of registration for the Fingerlings Works are *prima facie* evidence of the validity of the copyrights and the facts stated in such registrations. *See Yanofsky Dec.*, ¶ 9, *Ex.* B.

### i)  *Defendants Infringed Plaintiffs' Fingerlings Works*

To establish infringement, "the copyright owner must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible [sic] elements of plaintiff's [work]." *Yurman Design, Inc. v. PAJ Inc.*, 262 F.3d 101, 110 (2d Cir. 2001).

A plaintiff may demonstrate actual copying "either by direct or indirect evidence." *P&G v. Colgate-Palmolive Co.*, 199 F.3d 74, 77 (2d Cir. 1999) (internal citations omitted).  "Indirect copying may be shown by demonstrating that the defendant had access to the copyrighted work and that the similarities between the works are probative of copying." *Id.*  "Generally, an allegedly infringing work is considered substantially similar to a copyrighted work if the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them,

41

and regard their aesthetic appeal as the same." *Mint, Inc.*, 2011 U.S. Dist. LEXIS 49813, at *7 n.16 (quoting *Boisson v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir. 2001)).

In the instant matter, a representative sample of side-by-side comparisons of Plaintiffs' Fingerlings Works to Defendants' Infringing Products and/or Defendants' Infringing Listings, as depicted in Exhibit A to the *Brennan Dec.*, illustrates that Defendants are copying one or more of the Fingerlings Works by reproducing and/or displaying substantially similar, if not identical, imitations of the Fingerlings Works either embodied in the Infringing Products themselves and/or in connection with the offering for sale and/or sale of Infringing Products. *See Arnaiz Dec.*, ¶¶ 6-7, *Ex.* A; *Yanofsky Dec.*, ¶ 23; and *Brennan Dec.*, ¶¶ 16-18, *Ex.* A. Without doubt, Defendants have taken the original and well known elements of the Fingerlings Works – comprised of the photographs of the Fingerlings Products sculptures and associated artwork – and have used the same and/or elements thereof in Defendants' Infringing Listings for their Infringing Products. *See Brennan Dec.*, ¶¶ 16-18, *Ex.* A. In addition, the fact that Defendants' imitations of the Fingerlings Works are virtually indistinguishable therefrom, coupled with Plaintiffs' significant and widespread advertising efforts, also show that Defendants unquestionably had "access" to the Fingerlings Works. *See id.*; *Mint, Inc.*, 2011 U.S. Dist. LEXIS 49813, at *7; and *Stora v. Don't Ask Why Outfitters,* 2016 U.S. Dist. LEXIS 170172, at *12 (E.D.N.Y. Dec. 7, 2016). Plaintiffs have adduced evidence showing its widespread use of its Fingerlings Works as well as the extensive advertising and widespread distribution of the Fingerlings Products, thereby demonstrating that Plaintiffs' assertion of Defendants' access to the Fingerlings Works is more than mere speculation, and instead, Plaintiffs have demonstrated, at a minimum, "evidence of a reasonable possibility of access." *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988).

Moreover, Defendants' infringing use of the Fingerlings Works is clearly also more than *de minimis*, and as detailed *supra*, the elements copied by Defendants from the Fingerlings Works are original to Plaintiffs. Defendants have taken entire and/or core elements of the Fingerlings Works and have used these, or nearly identical replicas thereof, in connection with the advertising, marketing, distributing, offering for sale, and/or sale of the Infringing Products. In many instances, Defendants have directly copied one or more of the individual components of the Fingerlings Works, and have used such elements together in Defendants' Infringing Listings. *See Brennan Dec.*, ¶¶ 16-18, *Ex.* A, and *Arnaiz Dec.*, *Ex.* A. Thus, Plaintiffs have established substantial similarity between the Fingerlings Works and Defendants' imitations, and that Defendants copied the same. *See Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003) (finding that a near-exact copy was substantially similar and therefore, infringing, when such a copy incorporated plaintiff's original selections, even though the copy contained additional elements). Accordingly, Plaintiffs are likely to succeed on the merits of their copyright claims.

### 4. **Plaintiffs are Likely to Prevail on their State Law Claims**

Because Plaintiffs have shown a likelihood of success on its Lanham Act claims, Plaintiffs have also shown a likelihood of success on their deceptive trade practices, false advertising, unfair competition and unjust enrichment claims under New York State law. *See N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 521 (S.D.N.Y. 2013) ("The analysis of the merits of plaintiff's state law claims [including false advertising] is not materially different"); *Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 348 F. Supp. 2d 165, 177-178, fn. 6 (S.D.N.Y. 2004) ("the standards for analysis for plaintiff's New York state law claims [for false advertising and false marketing] are the same as those for analysis of the

Lanham Act claims in all relevant respects"); *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273 (S.D.N.Y. 2002) (likelihood of success on federal infringement claims supports likelihood of success on New York state unfair competition and deceptive business practices).

### 5. **The Balance of Hardships Favors Plaintiffs**

The balance of hardships unquestionably and overwhelmingly favors Plaintiffs in this case. Here, as described above, Plaintiffs have suffered, and will continue to suffer, irreparable harm to their business, the value, goodwill and reputation built up in and associated with the Fingerlings Marks and Fingerlings Works, and to their reputation as a result of Defendants' willful and knowing sales of substandard imitations of the Fingerlings Products. *See Yanofsky Dec.*, ¶ 28. In contrast, any harm to Defendants would only be the loss of Defendants' ability to continue to offer their Infringing Products for sale, or, in other words, the loss of the benefit of being allowed to continue to unfairly profit from their illegal and infringing activities. "Indeed, to the extent defendants 'elect[] to build a business on products found to infringe[,] [they] cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Broad. Music, Inc. v. Prana Hosp.*, Inc., 158 F. Supp. 3d 184, 196 (S.D.N.Y. 2016) (quoting *Mint, Inc.*, 2011 U.S. Dist. LEXIS 49813, at *3) (internal quotation marks and citation omitted); *see also Mitchell Group USA LLC*, No. 14-cv-5745 (DLI)(JO), 2014 U.S. Dist. LEXIS 143001 at *6-7 (citing *Philip Morris USA Inc. v. 5 Bros. Grocery Corp.*, No. 13-CV-2451 (DLI)(SMG), 2014 U.S. Dist. LEXIS 112274, 2014 WL 3887515 (E.D.N.Y. 2014) ("Absent an injunction, there will be further erosion of plaintiff's goodwill and reputation. Defendants, on the other hand, will be called upon to do no more than refrain from what they have no right to do in the first place.")).

6.  **Enjoining Defendants from Using the Fingerlings Marks and Fingerlings Works Will Serve the Public Interest**

The public interest will be served by the issuance of a temporary restraining order and preliminary injunction, as "the public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010); *see also CJ Prods. LLC*, 809 F. Supp. 2d at 149 ("the public interest is served by preventing customer confusion or deception"). Here, the public has an interest in being able to rely on the high quality of the Fingerlings Products bearing and/or sold in connection with the Fingerlings Marks and Fingerlings Works. Since Defendants have willfully and knowingly inserted substandard Infringing Products into the marketplace, the public would benefit from a temporary restraining order and preliminary injunction halting any further sale and distribution of Defendants' Infringing Products. *See Arnaiz Dec.*, ¶¶ 6-7, *Ex.* A and *Brennan Dec.*, ¶¶ 15-17.

C.  **PLAINTIFFS ARE ENTITLED TO AN ORDER PREVENTING THE FRAUDULENT TRANSFER OF ASSETS**

Considering the nature of Defendants' counterfeiting businesses, and Plaintiffs' showing that they have a high likelihood of succeeding on the merits of all of its claims, Plaintiffs will be entitled to an equitable accounting of Defendants' profits from their sales of Infringing Products. Accordingly, an asset freeze order granting Plaintiffs information regarding the location of all money, securities or other property or assets of Defendants (whether said assets are located in the U.S. or abroad) ("Defendants' Assets"), the attachment of Defendants' Assets and an injunction preventing the transfer from or to accounts associated with or utilized by any Defendants or any Defendants' Online Accounts (whether said account(s) is/are located in the U.S. or abroad) ("Defendants' Financial Accounts") by all banks, financial institutions, credit card companies

and payment processing agencies, such as PayPal Inc. ("PayPal"), Payoneer Inc. ("Payoneer"), the Alibaba Group d/b/a Alibaba.com and Aliexpress.com ("Alibaba") and Dunhuang Group d/b/a DHgate.com ("DHgate") payment services (*e.g.*, Alipay.com Co., Ltd., Ant Financial Services Group, or DHpay.com), and other companies or agencies that engage in the transfer of real or personal property of Defendants (collectively, "Financial Institutions") and online marketplace platforms, including, without limitation, those owned and operated, directly or indirectly, by Alibaba and DHgate, such as Alibaba.com, AliExpress.com and DHgate.com, as well as those platforms and/or entities identified as a result of any expedited discovery order entered in the Lawsuit ("Third Party Service Providers") to preserve Plaintiffs' right to the relief sought in the Complaint, is both necessary and appropriate, and is within this court's discretion. *See* 15 U.S.C. § 1117(a); *see also, e.g., Balenciaga Am., Inc. v. Dollinger*, No. 10 Civ. 2912 (LTS), 2010 U.S. Dist. LEXIS 107733, at *22 (S.D.N.Y. Oct. 8, 2010) (citing *Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, No. 00 Civ. 8051 (JSM), 2000 U.S. Dist. LEXIS 15664, at *4 (S.D.N.Y. 2000) ("[W]here plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains it equitable power to freeze assets."); *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 71-72 (2d Cir. 1998) ("A district court faced with a Lanham Act violation possesses some degree of discretion in shaping [the] relief according to the principles of equity and the individual circumstances of each case" within the parameters of allowing an accounting for profits); *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992); *Tiffany (NJ) LLC v. Forbse*, No. 11 Civ. 4976 (NRB), 2012 U.S. Dist. LEXIS 72148, at *34 (S.D.N.Y. 2012); and *Warner Bros. Entm't Inc. v. Doe*, No. 14 Civ. 3492 (KPF), 2014 U.S. Dist. LEXIS 190098 (S.D.N.Y. May 29, 2014).

Plaintiffs may obtain an order restraining Defendants' Assets by demonstrating a "likelihood dissipation of the claimed assets, or other inability to recover money damages, if relief is not granted." *Datatech Enters. LLC v. FF Magnat Ltd.*, 2012 U.S. Dist. LEXIS 131711 (N.D. Cal. Sept. 14, 2012) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009)). District courts have the "authority to freeze those assets which could [be] used to satisfy an equitable award of profits." *North Face Apparel Corp. v. TC Fashions, Inc.*, 2006 U.S. Dist LEXIS 14226, at *10 (S.D.N.Y. Mar. 30, 2006) (internal citation omitted). In doing so, a court "may exempt any particular assets from the freeze on the ground that they [are] not linked to the profits of allegedly illegal activity." *Id.* at *11. Yet, the onus is on "the party seeking relief [from any such asset freeze] to 'present documentary proof'" that its profits do not stem from such illegal activity. *Id.*

Under 15 U.S.C. § 1117(a) and 17 U.S.C. § 504(b), a plaintiff in an action arising thereunder is entitled to recover a defendant's profits derived from the counterfeiting and/or infringement and/or plaintiff's damages. The Supreme Court specifically held that a copyright and/or trademark "infringer is required *in equity to account* for and yield up his gains to the true owner," and "profits are then allowed as an *equitable* measure of compensation." *Gucci Am. v. Bank of China*, 768 F.3d 122, 131-132 (2d Cir. 2014) (quoting *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 259 (1916) (emphasis added) and *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399 (1940) ("[R]ecovery [of profits] had been allowed in equity [prior to the statutory remedy] both in copyright and patent cases as appropriate equitable relief incident to a decree for an injunction."); *see also Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014) (noting that recovery of profits "is not easily characterized as legal or equitable," but treating profit-recovery remedy under Copyright Act as "equitable") (internal citation

omitted).  Specifically, with respect to claims involving the infringement of federally registered copyrighted works and/or those arising under the Lanham Act, it has been established in this Circuit, as well as sister circuits, that district courts have the authority to issue a prejudgment asset restraint injunction in favor of plaintiffs seeking an accounting, and/or another equitable remedy, against allegedly infringing defendants..  *See, e.g., Warner Bros. Entm't Inc. v. Doe,* 2014 U.S. Dist. LEXIS 190098 (S.D.N.Y. May 29, 2014); *Microsoft Corp. v. Jun Yan,* 2010 U.S. Dist. LEXIS 14934 (Dist. Conn. Feb. 18, 2010); *CBS Broad. Inc. v. PrimeTime 24 J.V.,* 1999 U.S. Dist. LEXIS 6515 (S.D. Fla. Feb. 18, 1999) (granting Emergency Motion to Prevent Dissipation of Defendant's Revenues from Retransmission in context of a copyright infringement action, finding that the court's equitable powers authorized it to do so and that plaintiffs sought an equitable remedy, despite the fact that the Copyright Act explicitly authorized the award that plaintiffs sought); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.,* 51 F.3d 982 (11th Cir. 1995) (finding that the district court had the authority to freeze assets that could have been used to satisfy an equitable award of profits pursuant to 15 U.S.C. § 1117) and *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.,* 970 F.2d 552, 560 (9th Cir. 1992) ("Because the Lanham Act authorizes the district court to grant Reebok an accounting of Betech's profits as a form of final equitable relief, the district court had the inherent power to freeze Betech's assets in order to ensure the availability of that final relief."); and *Venus Fashion, Inc. v. Changchun Chengji Tech. Co.,* No. 16-cv-61752, 2016 U.S. Dist. LEXIS 188384 (S.D. Fla. July 22, 2016) (granting prejudgment asset freeze in context of copyright infringement action).

An asset freeze in the instant matter is unquestionably warranted because Defendants, who are foreign individuals and/or entities based in China, are manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or

selling Infringing Products to U.S. consumers solely via the Internet, and accepting payment for such Infringing Products in U.S. Dollars through Financial Institutions, thereby causing irreparable harm to Plaintiffs in the form of lost sales, loss of goodwill and loss of control of its reputation with licensees, retailers and consumers, and can, and most certainly have the incentive to, transfer and hide their ill-gotten funds if their assets are not frozen. *See Arnaiz Dec.*, ¶¶ 6-18, Ex. A; *Brennan Dec.*, ¶ 17.; *see also Allstar Marketing Group LLC v._GB Housewear Store, et al.*, No. 17-cv-7596-SHS, Dkt. 22 (S.D.N.Y. Oct. 12, 2017) (granting an asset freeze against a similar set of China-based Defendants operating User Accounts on the Digital Marketplaces); *Spin Master Ltd. and Spin Master, Inc. v. Alan Yuan's Store, et al.*, No. 17-cv-7422-DLC, Dkt. 19. (S.D.N.Y. Sep. 28, 2017) (granting an asset freeze against a similar set of China-based Defendants operating User Accounts on the Digital Marketplaces); *Spin Master Ltd. and Spin Master, Inc. v. Amy & Benton Toys and Gifts Co., Ltd.*, No. 17-cv-5845-VSB, Dkt. 17 (S.D.N.Y. Aug. 4, 2017) (granting an asset freeze against a similar set of China-based Defendants operating User Accounts on the Digital Marketplaces); *Ontel Products Corp. v. Auto Mall et al.*, No. 17-cv-5190-AT, Dkt. 6 (S.D.N.Y. July 18, 2017) (granting an asset freeze against a similar set of China-based Defendants operating User Accounts on the Digital Marketplaces); *Rovio Entertainment Ltd. and Rovio Animation OY v. Best Baby and Kid Store, et al.*, No. 17-cv-4884-KPF, Dkt. 6 (S.D.N.Y. June 28, 2017) (granting an asset freeze against a similar set of China-based Defendants operating User Accounts on the Digital Marketplaces); *Ideavillage Products Corp. v. chinafocus et al.*, No. 17-cv-3894-RA, Dkt. 19 (S.D.N.Y. May 24, 2017) (granting an asset freeze against a similar set of China-based Defendants operating User Accounts on the Digital Marketplaces); *Moose Toys Pty LTD et al. v. Guangzhou Junwei Trading Company d/b/a Backgroundshop et al.*, No. 17-cv-2561-LAK, Dkt. 12 (S.D.N.Y. May 11, 2017) (granting an

asset freeze against a similar set of China-based Defendants operating User Accounts on the Digital Marketplaces); *Rovio Entertainment Ltd. and Rovio Animation OY v. Angel Baby Factory d/b/a Angelbaby_factory et al.*, No. 17-cv-1840-KPF, Dkt. 11 (S.D.N.Y. March 27, 2017) (granting an asset freeze against a similar set of China-based defendants operating User Accounts on the Digital Marketplaces); *Ontel Products Corporation v. Airbrushpainting Makeup Store a/k/a Airbrushespainting et al.*, No. 17-cv-871-KBF, Dkt. 20 (S.D.N.Y. Feb. 6, 2017) (granting an asset freeze against a similar set of China-based defendants operating User Accounts on the Digital Marketplaces); *Ideavillage Products Corp. v. Bling Boutique Store, et al.*, No. 1:16-cv-09039-KMW, Dkt 9 (S.D.N.Y. Nov. 21, 2016) (also granting an asset freeze against a similar set of China-based defendants operating User Accounts on the Digital Marketplaces); *Dama S.P.A. v. Doe*, No. 15-cv-4528 (VM), 2015 U.S. Dist. LEXIS 178076, at *4-6 (S.D.N.Y. June 12, 2015) (agreeing that, "Plaintiff's concerns regarding the likelihood of dissipating assets merit the extraordinary remedy of *ex parte* relief and that there is a strong likelihood that advance notice of the motion would cause Defendants to drain their PayPal accounts, thereby depriving Plaintiff of the remedy it seeks") and *SEC v. Caledonian Bank Ltd.*, No. 15-cv-894, 2016 U.S. Dist. LEXIS 133298, at *2 (S.D.N.Y. Sep. 28, 2016) (granting plaintiff's request for an *ex parte* asset freeze based on plaintiff's assertion that Defendants were foreign entities, and therefore could easily move assets out of bank or brokerage accounts at a moment's notice). Therefore, Plaintiffs respectfully submit that this Court should exercise its inherent equitable power and freeze Defendants' Assets and Defendants' Financial Accounts for the purpose of preserving Defendants' funds and ensuring that a meaningful accounting of their profits can be made. Upon the entering of an asset freeze, Plaintiffs also request that the Court order Defendants and/or the Financial Institutions and/or the Third Party Service Providers to

immediately identify Defendants' Assets and Defendants' Financial Accounts and the respective current account or fund balances of the same.

**D.    PLAINTIFFS ARE ENTITLED TO AN ORDER AUTHORIZING ALTERNATIVE SERVICE OF PROCESS BY ELECTRONIC MEANS**

Plaintiffs also request that this Court issue an order granting it permission to serve each respective Defendant via the following combination of electronic methods: 1) registered electronic mail, 2) messaging through Defendants' User Accounts and 3) website publication. Since, upon information and belief, Defendants are located in China, Fed. R. Civ. P. (4) governs service on Defendants in the instant matter.  While Defendants operate sophisticated commercial businesses offering for sale and/or selling Infringing Products to consumers in the U.S. – specifically including those in New York – such operations are limited to correspondence by email, messaging through their respective User Accounts and communications otherwise transmitted over the Internet. *See Arnaiz Dec.*, ¶¶ 6-18, *Ex.* A.  Therefore, Plaintiffs respectfully submit that service through electronic methods is appropriate and necessary in the instant matter.

Pursuant to Fed. R. Civ. P (4)(1), service may be effected "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents" ("Hague Convention"). "Article 10 of The Hague Convention, allows for service of process through alternative means such as 'postal channels' and 'judicial officers,'" provided that the destination state does not object to those means." *FTC v. PCCare247 Inc.*, No. 12 Civ. 7189 (PAE), 2013 U.S. Dist. LEXIS 31969, at *10 (S.D.N.Y. Mar. 7, 2013) (citing Hague Convention, November 15, 1965, Article 10).  Here, the destination state is China, which, like the U.S., is a signatory to the Hague Convention.  Despite China's objection to service by postal channels under Article 10, this Court has held that such objection does not include service by email and further, that service

by email is not prohibited by any international agreement. *See Sulzer Mixpac AG v. Medenstar Indus. Co.*, 312 F.R.D. 329, 332 (S.D.N.Y. 2015) (concluding that "China's objection to service by postal mail does not cover service by email, and these forms of communication differ in relevant respects, such as email communications may be more reliable than long-distance postal communications, and the arrival of an email at its destination address may be more readily tracked.").[15]   Moreover, the Hague Convention specifies that it "shall not apply where the address of the person to be served with the document is not known." *See* Hague Convention, November 15, 1965, Article 10.

Plaintiffs also may serve international defendants pursuant to Fed. R. Civ. P. 4(f)(3), which enables a court to grant an alternative method of service so long as it: "(1) is not prohibited by international agreement; and (2) comports with constitutional notions of due process." *SEC v. Anticevic*, No. 05 CV 6991 (KMW), 2009 U.S. Dist. LEXIS 11480, at *7 (S.D.N.Y. Feb. 8, 2009).   Notably, "[s]ervice under subsection [4(f)] (3) is neither a last resort nor extraordinary relief.   It is merely one means among several which enables service of process on an international defendant." *Sulzer Mixpac AG*, 312 F.R.D. 329, 330 (quoting *Advanced Aerofoil Techs., AG v. Todaro*, No. 11 Civ. 9505, 2012 U.S. Dist. LEXIS 12383, 2012 WL 299959, at *1 (S.D.N.Y. Jan. 31, 2012) (internal citations omitted)).   Since sellers on the Digital

---

[15] *See also, e.g., F.T.C. v. PCCare247 Inc.*, No. 12 Civ. 7189, 2013 U.S. Dist. LEXIS 31969, *10 (authorizing service by email and Facebook to defendants in India, and stating that "[n]umerous courts have held that service by email does not violate any international agreement where the objections of the recipient nation are limited to those means enumerated in Article 10."); *Gurung v. Malhotra*, 279 F.R.D. 215, 219-20 (S.D.N.Y. 2011) (authorizing service by email to India despite India's objections to service through postal channels under Article 10 of the Hague Convention, and stating that "[w]here a signatory nation has objected to only those means of service listed in Article [10] [of the Hague Convention], a court acting under Rule 4(f) (3) remains free to order alternative means of service that are not specifically referenced in Article [10]."); *S.E.C. v. Anticevic*, 2009 U.S. Dist. LEXIS 11480, at *4 (authorizing service by publication and noting that "[n]either Germany nor Croatia explicitly objects to service by publication in their Declarations pursuant to the [Hague] Convention."); and *In re S. African Apartheid Litig.*, 643 F. Supp. 2d 423, 434 (S.D.N.Y. 2009) (permitting service on counsel in Germany and noting that "[a]lthough Germany has objected to specific forms of service otherwise enumerated in the Hague Convention, it has not expressly barred alternative forms of effective service not referenced in the Hague Convention.").

Marketplaces, like Defendants, have been known to use aliases, false addresses and other incomplete identification information to shield their true identities and there are, in fact, only partial, incomplete or no physical addresses whatsoever associated with the majority of Defendants' User Accounts, this is exactly the circumstance where the courts should exercise, as they previously have exercised, the authority to grant alternative methods of service. *See id.* (quoting *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 115 (S.D.N.Y. 2010). "The decision whether to allow alternative methods of serving process under Rule 4(f)(3) is committed to the sound discretion of the district court." (internal quotation marks omitted)); *see also Brennan Dec.*, ¶¶ 11-13.

Courts in this Circuit have routinely authorized service by electronic mail in a number of similar cases to the instant one, "where a defendant was . . . alleged to be an online China-based counterfeiting network linked to a functioning email address but which otherwise remained anonymous." *Dama S.P.A.*, 2015 U.S. Dist. LEXIS 178076, at *6-7; *see also AW Licensing, LLC*, 2015 U.S. Dist. LEXIS 177101, at *18-19 (by demonstrating that service by registered electronic mail would provide adequate notice to defendants, the Court ordered that the plaintiff may continue to serve process on defendants by email). Similarly, courts have also authorized alternative methods of electronic service, such as service by Facebook messaging.[16]

In the instant matter, Plaintiffs propose using RPost (www.rpost.com), an online service that confirms valid proof of authorship, content, and delivery of an email, as well as the official time and date that the email was sent and received. *See Brennan Dec.*, ¶ 23. Other plaintiffs have used RPost in similar actions before this Court, which has allowed these plaintiffs to

---

[16] *See e.g. FTC v. PCCare247 Inc.*, 2013 U.S. Dist. LEXIS 31969, at *20 (ordering service by Facebook messaging); *Lipenga v. Kambalame*, No. GJH-14-3980, 2015 U.S. Dist. LEXIS 172778, at *9 (D. Md. 2015) (finding service via Facebook and email appropriate under Rule 4(f)(3)).

53

provide confirmation of delivery and receipt of service process on defendants by email.[17] Thus, service by electronic means would serve the interests of justice and principles of fairness.

Along with service via email and messaging on Defendants' accounts, Plaintiffs respectfully request that the Court, in its discretion, permit service via website publication. Publication on a website has been deemed appropriate service under Fed. R. Civ. P (4)(3) "so long as the proposed publication is 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *National Association for Stock Car Auto Racing, Inc. v. Does*, 584 F. Supp. 2d 824, 826 W.D.N.C. 2008) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315-16, 70 S. Ct. 652, 94 L. Ed. 865 (1950)). Here, Defendants have structured their businesses so that the sole means for customers to purchase Defendants' Infringing Products is by placing an order over the Internet. *See Arnaiz Dec.*, ¶¶ 8-11, *Ex.* A and *Brennan Dec.*, ¶¶ 3, 15. The fact that Defendants' businesses are entirely Internet-based thereby demonstrates the reliability of website publication as an additional means of service.

Ultimately, service on Defendants by various electronic means—namely email by way of RPost, messaging through Defendants' User Accounts and website publication—comports with due process, as it is "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 309. The majority of Defendants have not disclosed their mailing addresses, and even of those Defendants that have disclosed mailing addresses, such addresses are likely incomplete and/or false. *See Brennan Dec.*, ¶¶ 20-21. Due to Defendants' purposeful anonymity, service by email, with confirmation of delivery by RPost, messaging

---

[17] *See, e.g., The National Football League v. Mono Lee d/b/a nflnfl.us*, No. 11-CV-8911 (PKC) (S.D.N.Y. Dec. 7, 2011); and *The National Football League v. Chen Cheng d/b/a nfljerseydiscount.com*, No. 11-CV-09944 (WHP) (S.D.N.Y. Jan. 19, 2011).

through Defendants' User Accounts and website publication is most likely to provide Defendants with proper notice of this action and Plaintiffs' claims. *See Dama S.P.A.*, 2015 U.S. Dist. LEXIS 178076, at *7 (finding where service by email or other electronic means will provide adequate notice under Rule 4(f), such service is warranted and should be granted).[18] Therefore, Plaintiffs respectfully submit that an order allowing service of process via email, messaging through Defendants' websites and website publication will benefit all parties and the Court by ensuring that Defendants receive immediate notice of the pendency of this action and allowing this action to move forward expeditiously.

Plaintiffs also respectfully submit that the Court issue an order authorizing Plaintiffs to serve the Financial Institutions and/or Third Party Service Providers with notice of the Court's order of the Application via electronic means prior to serving Defendants and with enough time for the Financial Institutions and/or Third Party Service Providers to comply with the Court's order.

---

[18] *See also Allstar Marketing Group LLC v._GB Housewear Store, et al.*, No. 17-cv-7596-SHS. Dkt. 22 (S.D.N.Y. Oct. 12, 2017); *Spin Master Ltd. and Spin Master, Inc. v. Alan Yuan's Store, et al.*, No. 17-cv-7422-DLC, Dkt. 19. (S.D.N.Y. Sep. 28, 2017) (granting alternative service by electronic means including by email and messaging through Defendants' User Accounts on the Digital Marketplaces); *Spin Master Ltd. and Spin Master, Inc. v. Amy & Benton Toys and Gifts Co., Ltd.*, No. 17-cv-5845-VSB, Dkt. 17 (S.D.N.Y. Aug. 4, 2017) (granting alternative service by electronic means including by email and messaging through Defendants' User Accounts on the Digital Marketplaces); *Ontel Products Corp. v. Auto Mall et al.*, No. 17-cv-5190-AT, Dkt. 6 (S.D.N.Y. July 18, 2017) (granting alternative service by electronic means including by email and messaging through Defendants' User Accounts on the Digital Marketplaces); *Rovio Entertainment Ltd. and Rovio Animation OY v. Best Baby and Kid Store, et al.*, No. 17-cv-4884-KPF, Dkt. 6 (S.D.N.Y. June 28, 2017) (granting alternative service by electronic means including by email and messaging through Defendants' User Accounts on the Digital Marketplaces); *Ideavillage Products Corp. v. chinafocus et al.*, No. 17-3894-RA, Dkt. 19 *(S.D.N.Y. May 24, 2017)* (granting alternative service by electronic means including by email and messaging through Defendants' User Accounts on the Digital Marketplaces); *Moose Toys Pty LTD et al. v. Guangzhou Junwei Trading Company d/b/a Backgroundshop et al.*, No. 17-cv-2561-LAK, Dkt. 12 (S.D.N.Y. May 11, 2017) (granting alternative service by electronic means including by email and messaging through Defendants' User Accounts on the Digital Marketplaces); *Rovio Entertainment Ltd. and Rovio Animation OY v. Angel Baby Factory d/b/a Angelbaby_factory et al.*, No. 17-cv-1840-KPF, Dkt. 11 (S.D.N.Y. March 27, 2017) (granting alternative service by electronic means including by email and messaging through Defendants' User Accounts on the Digital Marketplaces); *Ontel Products Corporation v. Airbrushpainting Makeup Store a/k/a Airbrushespainting et al.*, No. 17-cv-871-KBF, Dkt. 20 (S.D.N.Y. Feb. 6, 2017) (granting alternative service by electronic means including by email and messaging through Defendants' User Accounts on the Digital Marketplaces); and *Ideavillage Products Corp. v. Bling Boutique Store, et al.*, No. 1:16-cv-09039-KMW, Dkt. 9 (S.D.N.Y. Nov. 21, 2016) (also granting alternative service by electronic means including by email and messaging through Defendants' User Accounts on the Digital Marketplaces)

## E.   PLAINTIFFS ARE ENTITLED TO AN ORDER AUTHORIZING EXPEDITED DISCOVERY

Additionally, Plaintiffs respectfully request that the Court order expedited discovery from Defendants, Financial Institutions and Third Party Service Providers regarding the scope and extent of Defendants' infringing activities, as well as Defendants' account details and other information relating to Defendants' Financial Accounts, Assets and/or any and all accounts with the Third Party Service Providers, including, without limitation any and all websites and/or Defendants' Online Accounts (as defined *infra*), which include, without limitation, any and all accounts held by or associated with Defendants, their respective officers, employees, agents, servants and all other persons in active concert with any of them ("User Accounts"), through which Defendants, their respective officers, employees, agents, servants and all persons in active concert or participation with any of them manufacture, import, export, advertise, market, promote, distribute, display, offer for sale, sell and/or otherwise deal in products, including Counterfeit Products which are held by or associated with Defendants, their respective officers, employees, agents, servants and all persons in active concert or participation with any of them including, without limitation, those owned and operated, directly or indirectly, by the Third Party Service Providers and the Financial Institutions ("Defendants' Online Accounts").

Generally, a party may not seek discovery prior to a Rule 26(f) conference unless authorized by a court order. *See* Fed. R. Civ. P. 26(d)(1). While in the past, Courts in this District have often applied a four factor test to determine when expedited discovery may be granted,[19] they now apply a more flexible "good cause" test to examine "the discovery request . . . on the entirety of the record to date and the *reasonableness* of the request in light of all the surrounding circumstances."

---

[19] ". . . the plaintiff must demonstrate (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *See Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.*, No. 94 Civ. 5620 (JFK), 1994 U.S. Dist. LEXIS 18457, at *7 (S.D.N.Y. Dec. 28, 1994).

*Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 326 (S.D.N.Y. 2005) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor,* 194 F.R.D. 618, 624 (N.D. Ill. 2000)).[20] Regardless of which test is applied, Plaintiffs have established that they are entitled to the expedited discovery requested. Plaintiffs have demonstrated both irreparable injury and its probability of success on the merits above, and taking into account the covert nature of Defendants, their business operations and the fact that they are foreign individuals or companies who have both the incentive and the capability to hide or destroy relevant business records and other discoverable information and documentation upon hearing of this action, Plaintiffs respectfully submit that there is good cause for this Court to grant Plaintiffs the expedited discovery requested herein because it will prevent further injury to Plaintiffs and assist Plaintiffs in pursuing their claims against Defendants and in recovering the damages to which it is entitled. *See Ayyash*, 233 F.R.D., at 327; *see also Yanofsky Dec.*, ¶ 28 and *Brennan Dec.*, ¶¶ 11-13, 20-21.

Despite the likelihood of success of Plaintiffs' claims and the injury they have and continue to endure, if this Court were to deny expedited discovery, Plaintiffs may lose the opportunity to effectively pursue its claims against Defendants because there are several aspects of Defendants' infringing activities that Plaintiffs are not yet able to confirm, including: 1) the true identities of Defendants, 2) the full scope of Defendants' infringing activities, 3) the source or location of Defendants' inventory of Infringing Products and/or 4) where the proceeds from Defendants' infringing activities have gone. *See Brennan Dec.*, ¶¶ 11-13, 20-21; *see also*

---

[20] *See, e.g., Malibu Media, LLC v. Doe*, No. 1:16-cv-02462-AJN, 2016 U.S. Dist. LEXIS 64656, at *4 (S.D.N.Y. May 16, 2016); *Malibu Media, LLC v. Doe*, No. 15 Civ. 4369 (AKH), 2015 U.S. Dist. LEXIS 87751, at *2-3 (S.D.N.Y. July 6, 2015); *Milk Studios, LLC v. Samsung Elecs. Co.*, No. 14 Civ. 09362 (PAC), 2015 U.S. Dist. LEXIS 38710, at *4-5 (S.D.N.Y. Mar. 25, 2015); *Admarketplace, Inc. v. Tee Support, Inc.*, No. 13 Civ. 5635 (LGS), 2013 U.S. Dist. LEXIS 129749, at *3-4 (S.D.N.Y. Sep. 11, 2013); *Dig. Sin, Inc. v. Does 1-176*, 279 F.R.D. 239, 241 (S.D.N.Y. 2012); and *Stern v. Cosby*, 246 F.R.D. 453, 457 (S.D.N.Y. 2007) (agreeing with the *Ayyash* Court that the more flexible approach is the better approach.).

*Admarketplace, Inc.*, 2013 U.S. Dist. LEXIS 129749, at *5 (finding that a plaintiff "who has a potentially meritorious claim and no ability to enforce it absent expedited discovery, has demonstrated good cause for expedited discovery"). Therefore, only through an order from the Court allowing expedited discovery will Plaintiffs be able to fully ascertain the extent of Defendants' infringing activities.

Plaintiffs respectfully request an *ex parte* Order allowing expedited discovery in order to permit it to discover certain identifying information, including information concerning all of Defendants' Financial Accounts, Assets and User Accounts and their sales of Infringing Products. The discovery requested on an expedited basis in Plaintiffs' [Proposed] Order has been limited to include only that which is essential to prevent further irreparable harm. Under Fed. R. Civ. P. 65(d)(2)(C), this Court has the power to bind any third parties who are in active concert with Defendants that are given notice of the Order to provide expedited discovery. Moreover, Financial Institutions and Third Party Service Providers have complied with similar requests for expedited discovery in like actions before this Court. *See supra*, fn. 11. Plaintiffs respectfully submit that its request should be granted.

### F.   PLAINTIFFS' REQUEST FOR A SECURITY BOND IN THE AMOUNT OF $5,000 IS ADEQUATE

Plaintiffs respectfully submit that in connection with the Court's order pursuant to its inherent equitable power requiring that the Defendants' Assets and Defendants Financial Accounts be frozen by the Financial Institutions and/or Third Party Service Providers, Plaintiffs' provision of security in the amount of $5,000 ("Security Bond") is more than sufficient. This Security Bond is equal to an amount that similar plaintiffs have posted in related cases before the Court. *See Rovio Entertainment Ltd. and Rovio Animation OY v. Best Baby and Kid Store, et al.*, No. 17-cv-4884-KPF, Dkt. 3 (S.D.N.Y. June 28, 2017); *Rovio Entertainment Ltd. and Rovio*

*Animation OY v. Angel Baby Factory d/b/a Angelbaby_factory et al.*, No. 17-cv-1840-KPF, Dkt. 11 (S.D.N.Y. March 27, 2017).[21] Moreover, this Court has gone as far as to hold that no security bond is necessary in similar circumstances. *See, e.g., Ontel Products Corp. v. Airbrushpainting Makeup Store a/k/a Airbrushespainting, et al.*, No. 17-cv-871 (KBF), Dkt. 20 (S.D.N.Y. Feb. 6, 2017).

The Second Circuit has held that "[d]istrict courts … are vested with wide discretion in determining the amount of the bond that the moving party must post." *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). Typically, "the amount of the bond posted is the limit that a wrongfully restrained party may recover," but the Court must also balance this against a likelihood of harm the non-movant would be able to show. *Interlink Int'l Fin. Servs., Inc. v. Block*, 145 F. Supp. 2d 312, 314 (S.D.N.Y. 2001); *see also Doctor's Assocs.*, 85 F.3d at 985. Plaintiffs believe that Defendants would be unable to show a strong likelihood of harm, and even if Defendants were to experience a likelihood of harm, such harm is outweighed by the harm to Plaintiffs, as described *supra*. For these reasons, Plaintiffs respectfully request that the Court, in accordance with Fed. R. Civ. P. 65(a), enter the Security Bond in the amount of $5,000.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that their Application be granted *ex parte* and that the Court enter: 1) a temporary restraining order; 2) an order to show cause why a preliminary injunction should not issue; 3) an asset restraining order; 4) an order authorizing alternative service by electronic mail and 5) an order authorizing expedited discovery against Defendants in the form of the [Proposed] Order accompanying this Application, and such

---

[21] *See also Allstar Marketing Group LLC v._GB Housewear Store, et al.*, No. 17-cv-7596-SHS. Dkt. 22 (S.D.N.Y. Oct. 12, 2017); *Spin Master Ltd. and Spin Master, Inc. v. Alan Yuan's Store, et al.*, No. 17-cv-7422-DLC, Dkt. 19 (S.D.N.Y. Sept. 28, 2017); *Ideavillage Products Corp. v. chinafocus et al.*, No 17-cv-3894-RA, Dkt. 19 (S.D.N.Y. May 24, 2017); *Ideavillage Products Corp. v. Bling Boutique Store, et al.*, No. 1:16-cv-09039-KMW, Dkt. 9 (S.D.N.Y. Nov. 21, 2016).

other relief to which Plaintiffs may show that they are legally entitled.

Dated:  November 28, 2017

Respectfully submitted,

EPSTEIN DRANGEL LLP

BY:

Mary Kate Brennan (MB 5595)
mbrennan@ipcounselors.com
Spencer J. Wolgang (SW 2389)
swolgang@ipcounselors.com
Jason M. Drangel (JD 7204)
jdrangel@ipcounselors.com
Ashly E. Sands (AS 7715)
asands@ipcounselors.com
EPSTEIN DRANGEL LLP
60 East 42nd Street, Suite 2520
New York, NY 10165
Telephone: (212) 292-5390
Facsimile: (212) 292-5391
*Attorneys for Plaintiffs*
*WowWee Group Limited,*
*WowWee Canada, Inc., and*
*WowWee USA, Inc.*